**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JESSE GONZALEZ,
             *Petitioner-Appellant,*

v.

ROBERT WONG, Warden of
California State Prison at San
Quentin,

             *Respondent-Appellee.*

No. 08-99025

D.C. No.
2:95-CV-02345-JVS

OPINION

Appeal from the United States District Court
for the Central District of California
Lourdes G. Baird and James V. Selna,
District Judges, Presiding

Argued and Submitted
January 10, 2011—Pasadena, California

Filed December 7, 2011

Before: Diarmuid F. O'Scannlain, William A. Fletcher, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton;
Partial Concurrence and Partial Dissent by
Judge W. Fletcher;
Partial Dissent by Judge O'Scannlain

20683

## COUNSEL

Robert Berke, Santa Monica, California; Mark E. Overland (argued), Scheper Kim & Overland LLP, Los Angeles, California, for the petitioner-appellant.

Joseph P. Lee, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

## OPINION

CLIFTON, Circuit Judge:

Jesse Gonzales[1] was convicted in a California state court of first degree murder, with a finding of the special circumstance of killing a law enforcement officer engaged in the lawful pursuit of his duties, and was sentenced to death. The Califor-

---

[1]It appears that Gonzales's name is spelled wrong in the case caption. This error dates back to his trial and is reflected in the caption of the California Supreme Court's decision as well. *People v. Gonzalez*, 800 P.2d 1159 (Cal. 1990). In order to avoid confusion we have retained the erroneous spelling in the caption, but have correctly spelled Gonzales's name in the opinion.

nia Supreme Court affirmed the conviction and sentence and denied Gonzales's petition for post-conviction relief. *People v. Gonzalez*, 800 P.2d 1159 (Cal. 1990). The district court denied his petition for habeas corpus under 28 U.S.C. § 2254, and he appeals that denial to us.

Gonzales's appeal requires us to consider and apply the decision of the United States Supreme Court earlier this year in *Cullen v. Pinholster*, ___ U.S. ___, 131 S. Ct. 1388 (2011). In that decision, the Court held that in reviewing the petition of a state prisoner for habeas relief under the Antiterrorism and Effective Death Penalty Act ("AEDPA") when the prisoner petitions for review of a claim adjudicated in the state courts on the merits under 28 U.S.C. § 2254(d)(1), a federal court may consider only the record that was before the state court when it adjudicated the claim.

One of the arguments made by Gonzales to the California Supreme Court and rejected by that court was that the prosecutor failed to turn over exculpatory material as required under *Brady v. Maryland*, 373 U.S. 83 (1963), and related cases. The argument specifically referred to information concerning one prosecution witness, a jailhouse informant named William Acker. Acker testified during the guilt and penalty phases of Gonzales's trial that Gonzales had admitted that he intentionally killed the deputy sheriff, in effect confessing to Acker that he was guilty of the crime and special circumstance alleged. Some material regarding Acker was turned over by the prosecutor to Gonzales's defense counsel prior to trial, but other material, concerning Acker's mental state and credibility, was not. Despite diligent effort by Gonzales, some of the documents that were not turned over did not become known to Gonzales until they were obtained during the federal habeas proceeding in district court, after the state court had rendered its decision. Those materials were not, therefore, part of the state court record.

Under *Pinholster*, we may not consider those later-discovered materials in reviewing Gonzales's federal habeas claim. Because it appears to us that those materials strengthen Gonzales's *Brady* claim to the point that his argument would be potentially meritorious — that is, that a reasonable state court might be persuaded to grant relief on that claim — it is not appropriate for us to ignore those materials. We remand that portion of the case[2] to district court with instructions to stay the proceeding in order to give Gonzales an opportunity to return to state court and present his claim with the benefit of the materials that were not available and not part of the record at the time of the California Supreme Court decision. By that process, we seek to satisfy the intent of AEDPA, as discussed in *Pinholster*, 131 S. Ct. at 1398, that habeas claims of state prisoners be channeled in the first instance to state court.

We are not persuaded by the other arguments presented by Gonzales. Thus, we affirm the judgment of the district court as to most issues, but vacate the part of the judgment that denied the *Brady* claim (and related ineffective assistance of counsel claim, *see* note 2) and remand that claim to the district court with instructions to stay proceedings to permit Gonzales to present the claim to the California Supreme Court.

---

[2]In addition to the *Brady* claim, we also remand to the district court with similar instructions as to one of several ineffective assistance of counsel claims asserted by Gonzales, that being a claim that his counsel was ineffective for not earlier obtaining the materials that arguably would have impeached Acker. As we explain below, at 20698 note 7, that particular ineffective assistance claim substantially overlaps with the *Brady* claim. For clarity, we will generally not discuss or refer to that ineffective assistance claim separately, but when we refer to our disposition of the *Brady* claim we include that ineffective assistance claim as well.

## I.  Background

Eleven plain-clothed sheriff deputies arrived in three unmarked vehicles at the home of Gonzales's parents in La Puente to execute a search warrant on the evening of May 29, 1979. The search warrant was based on an undercover narcotics purchase made several days earlier from Gonzales's cousin at the residence. Four of the deputies approached the front door and one of them knocked and stated "Los Angeles Sheriff's Department. We have a search warrant. Open the door." Several seconds later the knock and announce was repeated.

The deputies heard what sounded like running and, fearing that narcotic evidence was being destroyed, they attempted to enter the house forcefully. Deputy Robert Esquivel eventually kicked in the door and his momentum carried him into the entryway. Esquivel saw Gonzales standing at the end of the hallway with a shotgun pointed at the front door. The shotgun blast missed Esquivel but hit Deputy Jack Williams who entered the house behind him. Williams died as a result of the shotgun wound. Gonzales was shot and apprehended by the deputies.

Gonzales was charged with first degree murder with the special circumstance of killing a peace officer who was engaged in the lawful pursuit of his duties. His trial was bifurcated into two phases, a guilt phase and a penalty phase. Each phase was tried before a different jury.

During the guilt phase, the facts of the shooting, as described above, were not disputed by the defense. Gonzales's defense was that he had not heard the officers' announcements and instead believed the officers were members of a rival gang, known as the Bassetts, coming to kill him and his cousin. The central question at trial was Gonzales's understanding and intent at the time of the shooting.

The prosecution presented significant evidence showing that Gonzales could not have believed that the officers were

gang members. All of the surviving deputies who were by the front door testified as to the manner of the entry and the shooting. In particular, they testified that while they were dressed in casual clothing, all of them, including the officer who was killed, had their badges either affixed to their jackets or in their hands. They also testified that they twice announced that they were police before entering the home. Additionally, an officer with expertise in gang-related crime testified that La Puente was no longer an area of high gang activity. He testified that almost all gang violence consisted of drive-by shootings, conduct very different from the actions of the officers serving the warrant. He also described the typical gang warrior as a Latino teenager and gave reasons why the officers, all of whom were in their 30's and, with the exception of Esquivel, were white, could not have been mistaken for gang warriors. Thus, the prosecution argued, Gonzales must have known that he was shooting at law enforcement officers, not rival gang members.

In addition, the prosecution presented evidence to support the contention that Gonzales not only knew he was shooting at officers but that he knew in advance that the police were coming and planned on using the raid as an opportunity to kill a police officer. This theory was based almost entirely on the testimony of William Acker, another prisoner held in the same jail as Gonzales. Acker testified that while in jail, Gonzales admitted to knowing that the men were officers because he had received a phone call informing him of the raid, and further that he planned to "bag a cop" when the officers served the warrant. Acker also testified that Gonzales had planned in advance to say that he believed the officers were Bassett members.

Gonzales sought to counter the prosecution's evidence. He attempted to show that he reasonably could have believed the officers were gang members. He presented evidence of other gang-related violence in La Puente. He relied on the testimony of two officers with whom he spoke shortly after the

shooting. Both officers testified that Gonzales told them he had believed the officers were Bassetts.[3] To explain why it was reasonable for Gonzales to believe that the Bassetts would storm his house to kill him, Gonzales sought to establish that he had been a former leader of the La Puente gang, rivals of the Bassetts.

Gonzales testified in his own defense. His testimony was that he was inside the house when he heard the cars pull into the driveway. He went to the window but did not recognize the men. He testified that he focused on a Latino male who he said was the front seat passenger in one of the cars. He stated that he believed that the men were Bassetts. He denied seeing badges or hearing the announcements.

While Gonzales denied knowingly killing a police officer, his testimony about the shooting was inconsistent with the facts as described by all of the officers who testified. Among the many inconsistencies was that he insisted that Esquivel, the only Latino officer, was sitting in the front passenger seat.

---

[3]Deputy Mace testified that while en route to the hospital, Gonzales said that he had believed that the men trying to enter his home were members of the Bassett gang and that he did not know they were police officers until he had been shot. The testimony of Sergeant Verdugo, who investigated the murder with his partner Sergeant Overlease, was somewhat less clear. Verdugo testified about what Gonzales said during an interview at the hospital early the following morning. Gonzales described the incident as a "freak accident." He initially stated that he was watering the lawn until he saw the "cops coming" and ran into the house. The record is unclear whether Gonzales recognized the men as "cops" when he saw them approaching the house, or whether his description of them as cops to Verdugo was based on his learning by the time of the interview that the men were police. The record is also unclear on what was said next. Verdugo testified at trial that Gonzales stated that he was confused. According to Verdugo's report of the conversation, Gonzales said that the officers were confused. It is undisputed that Gonzales then stated that he had been watering the lawn, but was inside with his infant son when he heard the cars arrive. He heard pounding and yelling at the door, but could not hear what was said. Gonzales reiterated to Verdugo that he believed the men were Bassett members.

All of the officers stated that Esquivel was driving one of the cars. Gonzales also denied that the cars he saw were the ones the officers had identified as their vehicles.

The defense also sought to counter Acker's testimony. Gonzales testified that he had never admitted to Acker that he knew the men were police officers. James Nobel, a prisoner who was housed in the cell between Acker and Gonzales, testified that he never saw Gonzales speak with Acker. Nobel also testified that Gonzales had asked him to read aloud the police reports of the incidents because Gonzales was illiterate. Both Gonzales and Nobel said that Acker could have overheard Nobel reading the police reports, which the defense argued explained how Acker knew specific facts about the shooting.

The defense also sought to impeach Acker. During cross examination, Acker admitted that he had previously pled guilty to a charge of murder and that he had provided evidence against his own wife concerning that murder. He denied being a police informant or giving information in other cases. He testified that he hoped giving the information would help him get transferred to an out-of-state prison because he believed he would be killed by gangs if he remained in California. He insisted, though, that he was testifying because "it was a step in the right direction" and would help him get balance in his life. Acker admitted that he could lie if he wanted to, but insisted that he was not lying about Gonzales's statements.

Gonzales was convicted of first degree murder and the special circumstance of killing a police officer engaged in the lawful pursuit of his duties. The case then moved to the penalty phase. The state sought the death penalty. The first penalty phase trial resulted in a hung jury. The penalty phase was retried before a different jury.

The state's penalty phase case was aimed at establishing aggravating factors that would outweigh any mitigating factors offered by Gonzales.[4] The primary aggravating factor offered by the state was the aggravated nature of the killing, which the state sought to establish by proving that Gonzales was aware of the police raid and had planned out the killing of the officer, including his Bassett excuse. The focal point of the state's case during the penalty phase was Acker's testimony that Gonzales had confessed to Acker all the key facts that the state argued made Gonzales's crime worthy of the death penalty.

During the penalty phase, the defense continued to maintain that Gonzales had believed the officers were gang members. However, faced with an existing guilty verdict on the charge of premeditated murder, the defense argued in the alternative that Gonzales did not know about the raid in advance and that therefore the crime was not so heinous and did not warrant the death penalty. For example, evidence was presented that Gonzales had gone to work that day and had not been waiting around for the officers. Gonzales did not testify again during the penalty phase, and no character evidence was presented on his behalf. The second penalty phase jury imposed the death penalty. The trial judge denied a motion for a retrial and a motion to modify the sentence.

Gonzales appealed his conviction and brought a petition for post-conviction relief to the California Supreme Court. The court considered both the appeal and the habeas petition at the same time. Gonzales's habeas petition claimed, among other

---

[4]Under the 1978 California death penalty statute, in effect at the time of Gonzales's crime and applied at his trial, the guilt phase jury first had to find the defendant guilty of first degree murder and one of the enumerated special circumstances. If that requirement was met, the penalty phase jury was instructed to consider aggravating and mitigating circumstances and to impose the death penalty if it concluded that the aggravating circumstances outweighed the mitigating circumstances. *See* Cal. Penal Code § 190.3 (1978).

things, ineffective assistance of counsel based on his trial counsel's failure to investigate and present positive character evidence. The California Supreme Court appointed a referee, a Superior Court judge, to review evidence and make factual findings as to what character evidence could have been uncovered by Gonzales's counsel and what evidence the prosecution may have presented in rebuttal.

At the referee hearing, Gonzales's trial counsel, Ralph Bencagey, testified about his investigation. He testified that he conducted it on his own and that he interviewed people from the neighborhood. He did not conduct an investigation into Gonzales's health or school records and did not have Gonzales tested for mental health impairments.

Gonzales also presented character witnesses at the referee hearing who testified that Gonzales was a kind individual who had a loving and caring relationship with his children as well as other children. Some also testified that he was a "slow" child and had never learned to read. However, several of these witnesses had limited interactions with Gonzales, and none were aware of his involvement with gangs. Two of the witnesses also described the tragic death of Gonzales's twin sisters in a train accident and the subsequent impact the tragedy had on Gonzales and his family. The referee made factual findings and filed a report with the California Supreme Court.

While Gonzales's case was pending before the California Supreme Court, a scandal erupted regarding false testimony by jailhouse informants in Los Angeles. Leslie White, a jailhouse informant, revealed that he and other informants in the Los Angeles County jail had fabricated confessions during the period from 1979 through 1988.[5] An investigation into the use

---

[5]Our court recently dealt with a case involving another informant from this period. *See Maxwell v. Roe*, 628 F.3d 486 (9th Cir. 2010). Our colleague, Judge Stephen Trott, who previously served as a Los Angeles Assistant District Attorney, has written and lectured extensively about the problems inherent in prosecutors' use of jailhouse informants. *See* Stephen S. Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1394 (1996).

of jailhouse informants by prosecutors found significant problems. While Acker was never officially identified as a jailhouse informant during the investigation, the revelations of how jailhouse informants had fabricated confessions led Gonzales's lawyers to seek additional discovery regarding Acker. Gonzales filed discovery motions which were heard by the judge who had presided over his trial. The trial court granted the request for further discovery, but the State sought a writ of mandamus from the California Supreme Court to overturn the discovery order. That issue was consolidated with Gonzales's habeas petition and direct appeal.

The California Supreme Court upheld Gonzales's conviction and death sentence and rejected his claims for habeas relief. *Gonzalez*, 800 P.2d 1159. On the discovery issue, the court held that the trial court could not authorize the discovery sought by Gonzales because it no longer had jurisdiction over the case. It also declined to grant the discovery requests under its direct appeal or habeas jurisdiction. *Id.* at 1256-61. The court stated, though, that "we expect and assume that if the People's lawyers have such information in this or any other case, they will disclose it promptly and fully." *Id.* at 1261. No such information was voluntarily disclosed to Gonzales.

Gonzales filed a petition for habeas corpus in federal court. The district court denied Gonzales's request for an evidentiary hearing on most of the claims, but it granted discovery on the claim that Gonzales's trial counsel failed to investigate and the state failed to disclose evidence that Acker was a government agent. This discovery did not unearth evidence that Acker was a government agent, but it did uncover impeachment evidence about Acker that had not been provided to the defense prior to the trial. Specifically, the state turned over six psychological reports prepared by prison psychologists on Acker while he had been incarcerated in California prisons between 1972 and 1979. These reports, discussed in more detail below, indicated that Acker had a severe personality disorder, was mentally unstable, possibly schizophrenic, and

had repeatedly lied and faked attempting suicide in order to obtain transfers to other facilities.

Based on this new evidence Gonzales moved for reconsideration of the denial of an evidentiary hearing on his ineffective assistance of counsel and *Brady* claims. The district court denied the request, holding that while the newly discovered evidence "strengthened some of the elements" of these claims, it did not establish materiality. The court subsequently denied Gonzales's other claims.

Gonzales sought and received a certificate of appealability from the district court under 28 U.S.C. § 2253[6] and brought this appeal.

## II.   Discussion

The provisions of AEDPA apply to Gonzales's petition because it was filed on September 20, 1996, after AEDPA's effective date. Under AEDPA, a federal court may not grant the writ based on any claim that was adjudicated on the merits by a state court unless the state court decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The district court's denial of a petition for a writ of habeas corpus is reviewed de novo. *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004).

---

[6]Gonzales failed to request a certificate of appealability on his claim of ineffective assistance of counsel based on the failure to investigate and present character evidence during the penalty phase. Gonzales claims to have inadvertently omitted this claim from his request and has asked this panel to grant one for it. Because the claim substantially overlaps with another claim which was certified, we conclude that the failure to request certification was an inadvertent mistake and grant the request for a certificate of appealability on this claim.

Gonzales has raised numerous claims in his habeas petition, some of which relate to the guilt phase, some to the penalty phase, and some to both. We begin by addressing his *Brady* claim, which he asserts as to both phases. It is the only claim on which we remand this case to the district court. We then address his other claims, which we conclude are not meritorious.

## A.   *Brady Claim*[7]

### 1.   Procedural History

Gonzales's state habeas petition raised a *Brady* claim based on allegations that the state failed to turn over evidence about Acker's criminal history. His argument was based on an inaccurate criminal history printout given to Gonzales's counsel. It showed Acker was serving a sentence of life without parole, when in fact he was sentenced to life with the possibility of

---

[7]Gonzales has also raised an ineffective assistance of counsel claim based on his counsel's failure to discover the impeachment evidence. The analysis of materiality for ineffective assistance of counsel is the same as the analysis of prejudice for *Brady*, *see United States v. Bagley*, 473 U.S. 667, 682 (1985), so our *Brady* prejudice analysis applies directly to this ineffective assistance of counsel claim. The district court rejected this ineffective assistance claim on the same ground that it rejected the *Brady* claim: the additional evidence was not material under *Brady* or prejudicial under *Strickland*. It is not clear to us that this ineffective assistance claim adds anything to Gonzales's *Brady* claim, but out of caution we resolve this ineffective assistance claim in the same way as the *Brady* claim. It is remanded to the district court with the same instruction to stay and abey, in order to give the state court the first opportunity to resolve the claim in light of the late-disclosed materials. In order to avoid confusion with the other ineffective assistance claims asserted by Gonzales, as to which we affirm the district court's dismissal, we will not separately discuss this ineffective assistance claim in this decision and will treat it as included within our discussion of the *Brady* claim.

By this action, we do not suggest any determination by us with regard to whether counsel's performance was so unprofessional as to satisfy the other prong under *Strickland*. In order to give the state court a fair opportunity to consider the issue, we will not take it up ourselves now.

parole. The criminal history also omitted several burglary convictions. Gonzales argued that the state's failure to correct these errors constituted a *Brady* violation. In addition, Gonzales argued that the state failed to inform him that Acker was providing information to the police in other criminal cases. The California Supreme Court rejected this claim, concluding that there was no prejudice because "these additional details do not paint a significantly different picture of Acker's character and motives than appears on the record." *Gonzalez*, 800 P.2d at 1193.

As noted above, Gonzales sought additional discovery about Acker from the state during the pendency of his state appeal. The state trial court granted Gonzales this discovery, but the California Supreme Court overturned the discovery order. This effectively ended Gonzales's ability to pursue additional *Brady* claims in state court.

Gonzales's initial federal habeas petition raised a *Brady* claim based on the same withheld evidence that was the subject of his state petition. The district court held that Gonzales suffered no prejudice from the withholding of the material and denied the request for an evidentiary hearing. When additional suppressed evidence was uncovered, Gonzales twice moved for re-consideration of his *Brady* claim. The district court twice denied the request, concluding that while the newly discovered evidence "strengthened some of the elements" of these claims, it did not establish materiality. The court based its conclusion on its belief that Acker was adequately impeached and his testimony was corroborated by other evidence. Notably, the district court concluded that "[a]t the guilt phase, and to a lesser degree at the penalty phase, this was not a case where it is likely the jury had to believe Acker's testimony in order to believe the prosecution's theory."

## 2. *Cullen v. Pinholster*

After we heard oral arguments in this case, the Supreme Court filed its decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011).[8] We ordered and received supplemental briefs from the parties regarding the impact of that decision. Two elements of *Pinholster* are of particular importance for the case before us.

**[1]** First, *Pinholster* specifically held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398.

**[2]** Second, in announcing that holding, *Pinholster* emphasized that, under AEDPA, the state courts are to bear primary responsibility for adjudicating habeas claims brought by state prisoners. In the Court's words, AEDPA "demonstrate[d] Congress' intent to channel prisoners' claims first to the state courts. . . . 'The federal habeas scheme leaves primary responsibility with the state courts.' " *Id*. at 1398-99, (quoting *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (per curiam)).

The Acker psychological reports were not part of the record when the California Supreme Court rendered its decision because they were not obtained by Gonzales until later, while

---

[8]Recently we followed *Pinholster* in denying a habeas petitioner's request for an evidentiary hearing relating to an ineffective assistance of counsel claim involving new evidence not presented to the state court. *See Stokley v. Ryan*, ___ F.3d ___, 2011 WL 4436268 (9th Cir. Sep. 26, 2011). We concluded that we did not have to determine whether *Pinholster* applied in that case, however, because the petitioner's claim failed either way. *Id*. at *4. The present case poses a different situation, however, as the only relief sought by the petitioner in Stokley was for an evidentiary hearing. *Id*. at *6. Further, we found that the petitioner in Stokley did not present a colorable ineffective assistance of counsel claim, *id*. at *6-11, whereas the new evidence of psychological reports presented by Gonzales could make a colorable *Brady* claim.

he was pursing his federal habeas petition in district court. A *Brady* claim was made before the state court, but it was narrower because Gonzales was not aware at the time of the psychological reports that had been withheld. As we discuss in detail below, we have concluded that the Acker psychological reports might have been helpful to Gonzales's defense. Before discussing those reports, however, it is necessary to determine what consideration, if any, we can properly give to them in light of *Pinholster*.

Gonzales argues that *Pinholster*'s limitation of our review to the record before the state court does not apply to his *Brady* claim based on the psychological reports because it is a "new claim," not decided on the merits by the California Supreme Court. In *Pinholster* the Court referenced but declined to draw the dividing line between a "new claim" and a claim decided on the merits by the state court and subject to review under § 2254(d). Justice Sotomayor's dissent in *Pinholster* questioned how the Court's holding would apply to a hypothetical situation somewhat similar to the one before us: a petitioner who diligently pursued a *Brady* claim in state court is denied relief on the grounds that the withheld evidence presented in the *Brady* claim was not material, but subsequently is able to force production of additional undisclosed exculpatory evidence. *Pinholster*, 131 S. Ct. at 1417-18 (Sotomayor, J., dissenting). The majority opinion written by Justice Thomas responded to Justice Sotomayor's concern by noting that "Justice Sotomayor's hypothetical involving new evidence of withheld exculpatory witness statements may well present a new claim," but stated that it did "not decide where to draw the line between new claims and claims adjudicated on the merits." *Id.* at 1401 n.10 (internal citation omitted).

**[3]** Under the circumstances, we conclude that *Pinholster* applies here and prevents us from considering the new evidence in reviewing Gonzales's *Brady* claim under § 2254(d). Gonzales raised and the state court explicitly rejected a *Brady* claim regarding information about Acker. Moreover, the sug-

gestion that Gonzales has presented a "new claim" inherently invites questions regarding exhaustion. In light of *Pinholster*'s emphasis on the primary responsibility of the state court, we conclude that the new evidence needs to be presented to the state court before it can be considered by us on habeas review of the state court's decision.

That does not mean that we can or should disregard the new evidence, however. We cannot fault Gonzales for a lack of diligence with respect to the withheld reports. Responsibility for the late appearance of those documents lies with the state. Despite discovery requests by Gonzales's trial counsel and the inherent obligation of the prosecutor to turn over exculpatory material, these reports were withheld. Gonzales made further discovery requests while pursuing post-conviction relief in state court, but the California Supreme Court granted the State's request to set aside the trial court's order permitting the discovery. That court did so while expressing its expectation that prosecutors would voluntarily and promptly turn over any such evidence, but that expectation was not fulfilled. For us simply to ignore the materials that did not emerge until the federal habeas proceedings would be to reward the prosecutor for withholding them.

**[4]** As discussed below, we conclude that if the new evidence were considered, Gonzales could make a colorable or potentially meritorious *Brady* claim, meaning that a reasonable state court could conclude that the withholding of the psychological reports constituted a *Brady* violation at the guilt phase, the penalty phase, or both. Because the claim is not clearly meritless, we do not believe dismissal of Gonzales's *Brady* claim is the appropriate result.

**[5]** We conclude that the appropriate course for us at this point is to remand to the district court with instructions that it stay and abey the habeas proceedings to allow Gonzales to present to state court his *Brady* claim including the subsequently-disclosed materials. In effect, we follow the

suggestion offered by Justice Breyer in his concurring opinion in *Pinholster* that a petitioner "can always return to state court presenting new evidence not previously presented. If the state court again denies relief, he might be able to return to federal court to make claims related to the latest rejection." *See Pinholster*, 131 S. Ct. at 1412 (Breyer, J., concurring).[9]

The stay and abey process is the same process that may be employed when a petitioner files a petition containing unexhausted claims. In *Rhines v. Weber*, 544 U.S. 269, 278 (2005), the Court instructed that "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics . . . the district court should stay, rather than dismiss" the petition. Here, Gonzales had good cause for not presenting the new evidence to the state court, has not engaged in intentional dilatory litigation tactics, and, as is explained below, has a potentially meritorious claim.

This course provides the state court with the first opportunity to resolve this claim. It also protects Gonzales's interest in obtaining federal review of his claim. As in the case of unexhausted claims that meet the *Rhines* requirements, Gonzales's "interest in obtaining federal review of his claims outweighs the competing interests in finality and speedy resolution of federal petitions." *Id.* Once the state court has spoken on this claim, Gonzales may, if necessary, return to district court and reactivate the federal proceedings.

We now turn to a discussion of the new materials. Our discussion below is only to demonstrate why we conclude that Gonzales has a colorable or potentially meritorious *Brady* claim such that a reasonable state court could find a *Brady*

---

[9]The separate opinion of Judge O'Scannlain, dissenting in part, disagrees with this portion of our decision in this case. The majority's response to the partial dissent appears below, at 20734-36.

violation. We do not decide whether there was a *Brady* violation. That determination is for the California Supreme Court to make in the first instance.

### 3.   A Potentially Meritorious *Brady* Claim

"The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation" by prosecutors. *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). As the Supreme Court recognized in 1935, a prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). In subsequent decisions, most notably *Brady*, the Court has consistently "underscored the 'special role played by the American prosecutor in the search for truth in criminal trials.' " *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)).

The Supreme Court has also repeatedly reaffirmed that *Brady* is one of the central bulwarks against injustice in our criminal justice system. The Court has stressed the central premise of *Brady*; even though an individual prosecutor may win a conviction, society as a whole loses when that conviction is wrong. Our system, therefore, places a "duty [on prosecutors] to refrain from improper methods calculated to produce a wrongful conviction." *Cone v. Bell*, ___ U.S. ___, 129 S. Ct. 1769, 1782 (2009) (quoting *Berger*, 295 U.S. at 88). Principal among a prosecutor's duties is to provide a defendant with all material exculpatory and impeachment evidence prior to trial. This obligation recognizes the significant advantage the state has over an individual defendant in regards to gathering information and seeks to level the playing field. We expect our government to fight fair and not deny a defendant evidence that could exculpate him or ameliorate the penalty he faces. Only by giving a defendant this evidence

can the government ensure that "justice is done its citizens in the courts." *Brady*, 373 U.S. at 87.

The elements of a claim for a *Brady* violation are that "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82. The state does not appear to contest the first two elements, so we discuss these only briefly before turning to the issue of materiality, which the state does contest.

### a. Favorable to the Accused

In *United States v. Bagley*, the Supreme Court recognized that "[i]mpeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule," because it is "favorable to an accused." 473 U.S. 667, 676 (1985). There is a colorable argument that the psychological reports could have been used to impeach Acker. Impeaching Acker was important for Gonzales's defense in both phases. Gonzales can, therefore, make a colorable argument that the withheld evidence was favorable to him.

### b. Evidence was Suppressed

Gonzales can also make a colorable argument that the evidence was suppressed. *Brady* does not require a showing that the state willfully or intentionally suppressed the evidence; even inadvertent suppression will satisfy this prong of the test. *See Brady*, 373 U.S. at 87 (suppression of evidence by prosecution violates due process "irrespective of the good faith or bad faith of the prosecution"). The psychological reports were in the possession of the prosecutor's office prior to the trial. Even if they had not been, a prosecutor has a duty under *Brady* to "learn of any exculpatory evidence known to others acting on the government's behalf." *Carriger v. Stewart*, 132

F.3d 463, 479-80 (9th Cir. 1997) (en banc) (prosecutor violated *Brady* when he did not turn over witness's prison records); *see also Strickler*, 527 U.S. at 275 n.12.

### c. Materiality

Suppressed evidence is material if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In other words, the petitioner does not need to prove that a different result would have occurred, just that there is "a reasonable probability of a different result." *Id.* at 434 (internal quotation marks omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* We conclude that a reasonable state court could conclude that there was a reasonable probability of a different result if the information contained in the psychological reports had been available to the defense and presented to the juries.

We reach this conclusion by undertaking a two-step inquiry. First, we ask whether a reasonable state court could conclude that there was a reasonable probability that the new evidence would have changed the way in which the jurors viewed Acker's testimony. We determine that a state court could so conclude. We then ask whether a reasonable state court could conclude that there was a reasonable probability that this change would have resulted in a different verdict during either or both phases. We conclude that given Acker's role in both phases, there is a potentially meritorious claim that there was a reasonable probability of a different verdict at one or both phases.[10]

---

[10]We recognize that it was probably true, as the district court suggested, that Acker's testimony held greater importance in the penalty phase than in the guilt phase. We need not decide here whether the evidence was actually material in one or both of the trials, as that conclusion should be made in the first instance by the state court.

i.  Jurors' view of Acker

**[6]** Our inquiry into how the jurors viewed Acker is primarily focused on how the withheld evidence could have provided additional or alternative means of impeachment. There is a colorable argument that a factfinder would have found the information about Acker contained in these reports disturbing, and that it would have been difficult for anyone, let alone a reasonable factfinder, to trust the witness described in these reports. The reports were prepared by psychologists employed by the State. They characterized Acker as predatory, manipulative, and unscrupulous, and they detailed his past lies and manipulations. *See Benn v. Lambert*, 283 F.3d 1040, 1055 (9th Cir. 2002) (evidence that witness "had regularly lied" and "was untrustworthy and deceptive" would have "severely undermined his credibility.").

Perhaps the most severe examples of Acker's manipulative and deceptive behavior were the three occasions when he faked committing suicide in order to obtain prison transfers or otherwise influence his placement within the prison system. A 1972 Psychiatric Evaluation reported that Acker admitted that he had faked suicide at the Norwalk Receiving Center in order to be placed in the hospital, from which it would be easier to escape. A 1973 Psychiatric Evaluation reported an attempted hanging, which Acker stated "was only a gesture designed to prevent his egress from CMC East," the hospital in which he had been placed. Finally, a 1974 report described another fake suicide attempt in April or May of 1974, which Acker said he faked because "he wanted out" of the facility.

Beyond the fake suicide attempts, the reports specifically described Acker's other manipulative behavior. One of the psychiatrists reported that Acker asked, "how much money would it take to give me a good report.' " Another psychiatrist described Acker as "the type of an individual who was constantly testing me." The 1979 diagnostic study prepared for Acker's sentencing for his murder conviction concluded that

he was "intelligent, manipulative, unscrupulous" and "capable of any measure of brutality in the service of achieving what he wants to do."

In addition to showing Acker to have a history of lying and manipulative behavior, the reports could be viewed to cast significant doubt on what Acker stated was his primary motivation for testifying against Gonzales. Acker repeatedly said that he was testifying because of a desire to turn his life around and do the right thing. The psychological reports showed that Acker had previously lied about reforming his life. The psychological report from 1972 stated that Acker told the psychologist he had turned his life around because he had "undergone a religious experience." After making these statements and being released from prison, he committed first degree murder and numerous robberies.[11] A subsequent social evaluation of Acker noted that he had been "offered therapy in the past and has used it as a tool to get out of prison early and has not attempted to use it as a tool to change his own behavior."

A reasonable state court could conclude that these prior statements would have enabled Gonzales to show that Acker's professed reason for testifying was false. A court could also conclude that Gonzales would have then been able to focus the jurors on Acker's "continuing interest in obtaining [the state's] favor" and that as a result "they might well have distrusted [Acker's] testimony, and insofar as it was uncorroborated, disregarded it." *Banks*, 540 U.S. at 701; *see also On Lee v. United States*, 343 U.S. 747, 757 (1952) (noting that testimony from witness receiving benefits from government "may raise serious questions of credibility").

**[7]** The reports also indicated that Acker had schizophre-

---

[11]The reports would also have shown that Acker was in fact a career criminal who first interacted with the law at age 8, and since the age of 14 had spent all but fourteen months incarcerated.

nia, which a reasonable state court could determine would have raised serious questions in the factfinder's mind about Acker's competency to perceive accurately and testify truthfully. As early as 1974, Acker was diagnosed with "[s]chizophrenia, chronic, undifferentiated type." In 1975, he was diagnosed with "[s]chizophrenia, residual type." A 1977 report noted that Acker was "mentally unstable" and had "a severe personality disorder, and he has previously been diagnosed as schizophrenic." Courts have long recognized the impeachment value of evidence that a government witness has a "severe illness, such as schizophrenia, that dramatically impaired [his] ability to perceive and tell the truth." *United States v. Butt*, 955 F.2d 77, 82-83 (1st Cir. 1992) ("For over forty years, federal courts have permitted the impeachment of government witnesses based on their mental condition at the time of the events testified to."). A reasonable state court could conclude that an assessment that Acker had not only lied in the past but had a mental condition that made him prone to lying could have affected the jury's evaluation of his credibility.

Finally, a state court could conclude that the psychiatric reports would have provided an opportunity to impeach Acker by showing that the state's own expert employees had repeatedly expressed doubts about Acker's credibility, truthfulness, and competency. *See Silva v. Brown*, 416 F.3d 980, 988 (9th Cir. 2005) (requirement witness not have psychological evaluation was evidence of "potentially devastating fact that the state itself doubted [the witness's] mental competency"); *Benn*, 283 F.3d at 1055 (evidence that police doubted veracity of informant because of past lies was material *Brady* evidence).

The state argues, and the district court concluded, that regardless of the impeachment value of this evidence, it was nevertheless not material because Acker was already sufficiently impeached. Defense counsel did present some impeachment evidence, but courts have repeatedly held that

withheld impeachment evidence does not become immaterial merely because there is some other impeachment of the witness at trial. Where the withheld evidence opens up new avenues for impeachment, it can be argued that it is still material. *See Banks*, 540 U.S. at 702 (rejecting argument that since witness was otherwise impeached withheld impeachment evidence was immaterial); *United States v. Kohring*, 637 F.3d 895, 905-06 (9th Cir. 2011) (even though witness was impeached on memory problems, evidence of alleged sexual misconduct and suborning perjury was not cumulative because it "would have added an entirely new dimension to the jury's assessment of [the witness]" such that " 'there is a reasonable probability that the withheld evidence would have altered at least one juror's assessment [of the evidence]' " (quoting *United States v. Price*, 566 F.3d 900, 914 (9th Cir. 2009))); *Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005) ("[T]hat the jury had other reasons to disbelieve [the witness] does not render the suppressed [impeachment evidence] immaterial."); *Benn*, 283 F.3d at 1055 ("The mere fact that a prosecution witness has a prior record, even when combined with other impeachment evidence that a defendant introduces, does not render otherwise critical impeachment evidence cumulative.").

While cumulative impeachment evidence might have been immaterial, a reasonable state court could determine that the psychology reports " 'provided the defense with a new and different ground of impeachment' " and as such were not cumulative. *Silva*, 416 F.3d at 989 (quoting *Benn*, 283 F.3d at 1056.) In *Silva*, the court recognized that even though the witness was impeached on his forthrightness, the withheld evidence, in that case a plea deal which prohibited the witness from undergoing a psychiatric evaluation prior to trial, was not cumulative because it related to his reliability. In *Carriger*, the district court had ruled that an informant's prison records, which described him as repeatedly lying, having a sociopathic personality, and being manipulative were immaterial for *Brady* purposes because the jury was made aware of

his burglary conviction and plea deal. 132 F.3d at 480-82. Recognizing that the withheld evidence opened a new avenue of impeachment, we reversed because "the government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative." *Id.* at 481

During both phases defense counsel did attempt to impeach Acker by his conviction for murder, his desire to be transferred to an out-of-state prison, previous cases where Acker had testified about jailhouse confessions, and his statement that he could lie when he wanted to, although he denied doing so in this case. None of the evidence presented at trial actually demonstrated Acker had lied in the past or that he was known to be manipulative and deceptive. *See Benn*, 283 F.3d at 1055 (evidence that informant had lied in the past was non-cumulative impeachment evidence). It is one thing for a witness to admit that he could lie; everyone can lie. Evidence of Acker's past lies, deception, and manipulation would have provided hard evidence, different from that already presented, to support Gonzales's argument that Acker was lying.

In addition, Gonzales has a colorable argument that the new evidence would have opened up other unexplored opportunities for impeachment. A reasonable state court could determine that none of the impeachment at trial touched on Acker's competency to perceive and tell the truth, which reasonably could have been put at issue by evidence that Acker was schizophrenic. Similarly, there is a colorable argument that none of the impeachment evidence available to Gonzales at trial allowed him to cast doubt on Acker's purported desire to turn his life around or demonstrate that the state had previously expressed doubts about Acker's veracity and competency.

Finally, Gonzales has a colorable argument that the jury believed Acker despite the impeachment evidence presented to them. This argument could rest in part on the fact that

Acker was an important witness for the government, especially during the penalty phase, and that "[i]n cases in which the witness is central to the prosecution's case, the defendant's conviction indicates that in all likelihood the impeachment evidence introduced at trial was insufficient to persuade a jury that the witness lacked credibility." *Benn*, 283 F.3d at 1055.

There is also documentary evidence that a reasonable state court could conclude supports the argument that the jury believed Acker. In a memo written after the first penalty phase trial resulted in a hung jury, the prosecutor stated that he spoke with the first penalty phase jurors and that most of them, including all of the women, found Acker's testimony convincing. Acker's testimony and defense counsel's cross examination were essentially the same in all three trials. Given that the cited jurors in the first penalty trial found Acker credible, this memo could be viewed to provide some evidence that the jurors in the other trials did as well.

**[8]** In light of the manner in which Acker was described in these reports and the potential new avenues of impeachment opened by these descriptions, we conclude that a reasonable state court could determine that a jury would have doubted Acker's veracity, motive for testifying, and competency if presented with the evidence in the psychological reports.

## ii. A Different Outcome

**[9]** We next consider whether there is a colorable argument that there is a reasonable probability that the additional impeachment of Acker through the psychological reports would have led to a different outcome at either the guilt or penalty phase. We conclude that a reasonable state court could decide that Acker's importance to the prosecution's cases was significant enough that additional impeachment of him reasonably could have changed the outcome.

**[10]** Acker's testimony amounted to a confession by Gonzales to first degree premeditated murder of a police officer, both the crime he was charged with and the facts the state argued warranted sentencing him to death. As the Supreme Court has noted "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.' " *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quoting *Bruton v. United States*, 391 U.S. 123, 139-40 (1968) (White, J., dissenting)); *see also Maxwell*, 628 F.3d at 507-08 (informant was "the 'make-or-break witness' " and his testimony about defendant's jailhouse confession was the "centerpiece of the prosecution's case"). While there was other circumstantial evidence, Acker's testimony was the only direct evidence establishing that Gonzales had a premeditated plan to kill a police officer.

In addition, a state court could conclude that the damage the suppressed impeachment evidence could cause was "best understood by taking the word of the prosecutor." *Kyles*, 514 U.S. at 444. The prosecutor spent time during his summations discussing Acker's testimony and countering the attempted impeachment of him, and a court could view this as further support for the proposition that Acker was central to the prosecution's cases. *See Horton*, 408 F.3d at 580 ("The prosecutor's emphasis on the importance of [the witness's] testimony bolsters the conclusion that disclosure of the [impeachment evidence] may have significantly damaged the prosecution's case."). There is also the memo written by the prosecutor after the hung jury in the first penalty trial, in which the prosecutor stated that his ability to retry the penalty phase depended on whether "Acker is available and is willing to testify." A reasonable state court could view the prosecutor's arguments and memo as evidence that Acker was important to the prosecution's case, especially in the context of the penalty phase.

**[11]** We do not decide here that the new evidence would have resulted in a different outcome in either phase. It is pos-

sible that even without this new evidence the jury did not believe Acker. It is also conceivable that, based on the other evidence presented to it, the jury could have concluded that Gonzales was guilty and deserved the death penalty. However, in order to establish a *Brady* violation, Gonzales would only have to show a "reasonable probability" that the outcome would have been different. Given the nature of Acker's testimony, a reasonable state court could conclude that Acker's testimony "was the glue that held the prosecution's case together," *Horton*, 408 F.3d at 579, and that there is a reasonable probability that further impeachment of Acker could have resulted in a different outcome.

### 4.   Remand to District Court

[12] Based on the above analysis, we conclude that Gonzales could make a potentially meritorious or colorable *Brady* claim based on the psychological reports. In order to allow the state court to consider this *Brady* claim and to ensure Gonzales can seek federal review of the claim if necessary, we remand the case as to this claim to the district court with instructions to stay and abey the case pending review of this claim by the California Supreme Court.[12]

---

[12]While Gonzales's *Brady* argument before this court focuses mostly on the Acker psychological reports, he also argues that the California Supreme Court erred by denying relief based solely on the evidence that Gonzales knew about and cited in his argument to that court, such that it is appropriate for us to grant habeas relief to him at this time. We disagree. Applying the AEDPA standard, we conclude that the determination of the California Supreme Court that there was no prejudice, based on the material known to it at the time of its decision, was not unreasonable. Gonzales's counsel was able to present evidence that Acker had committed murder and robbery in the past. The fact that he had committed several more robberies would not have painted a significantly different picture. Additionally, even though the criminal history printout indicated that Acker was not eligible for parole, Gonzales's counsel still questioned Acker on whether he hoped that his testimony would help him with the parole board. We do not resolve whether the cumulative effect of the materials alleged at the time of the state court decision to have been withheld and the later-disclosed materials was prejudicial. The California court may consider that question for itself.

*B.   Ineffective Assistance of Counsel: Character Evidence*

**[13]** As stated above, we are not persuaded by any of the other arguments presented by Gonzales. We start with several claims seeking relief based on ineffective assistance of counsel.

Gonzales contends that he received ineffective assistance of counsel during both the guilt and penalty phase because his attorney failed to investigate or present any character evidence during either phase. In order to establish ineffective assistance of counsel, a petitioner must prove both deficient performance by his counsel and prejudice caused by the deficiency. To demonstrate deficient performance Gonzales must show that counsel's performance "fell below an objective standard of reasonableness" based on "the facts of the particular case [and] viewed as of the time of counsel's conduct." *Strickland v. Washington*, 466 U.S. 668, 688-90 (1984). In order to establish prejudice Gonzales "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Because failure to meet either prong is fatal to Gonzales's claim, there is no requirement that we "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

The California Supreme Court rejected Gonzales's claims of ineffective assistance of counsel for failure to present character evidence. *See Gonzalez*, 800 P.2d at 1198-99.[13] Under

---

[13]The California Supreme Court only expressly ruled on this claim in regards to the penalty phase. However, "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 784 (2011).

AEDPA this conclusion is reviewed only to ensure it is not contrary to or an unreasonable application of federal law. In reviewing the California Supreme Court's ruling we are guided by the Supreme Court's instruction that when a petitioner raises a *Strickland* claim through a habeas petition governed by the AEDPA, he must surmount two highly deferential standards. *Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 778 (2011) ("Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)."). "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

### 1.   Guilt Phase

To support his claim of ineffective assistance of counsel during the guilt phase Gonzales points to evidence presented during the referee hearing conducted at the request of the California Supreme Court. At the hearing, witnesses testified that Gonzales was a loving father who cared about his children, was attentive to them, and was also caring towards other children. He argues that this evidence was relevant because the parties stipulated that Gonzales's infant son and another child were in the house when the shooting occurred. Gonzales argues that the character evidence would have strengthened his defense that he was not aware of the raid and was not planning to kill an officer, because if he had been, he would have made sure the children were out of the house.

**[14]** It was reasonable for the California Supreme Court to conclude that this claim was meritless because the failure to present this character evidence was not prejudicial. First, it is unlikely the witnesses Gonzales might have called would have been persuasive. Two of the witnesses, Dr. Furth and Mr. Clancy, had very limited contact with Gonzales. Dr. Furth admitted to basing her opinion on the few times that Gonzales had brought his children to her office for medical appoint-

ments. Mr. Clancy was Gonzales's middle school teacher and had seen him only a few times since then. The other witnesses, George Gonzales, Raymond de Jesus, Patricia Espinoza, and Maria Blanco, were either family or close friends, making their testimony suspect based on their close relationship with Gonzales and their admitted desire to help him avoid the death penalty.

Most importantly, none of these witnesses were aware of Gonzales's gang involvement. Gonzales's professed fear of a raid by the Bassetts necessarily highlighted his significant gang involvement, which would have cast doubt on how well the proposed witnesses knew him and on their ability to adequately judge his character. Furthermore, the fact that all of these witnesses would testify that they were unaware of Gonzales's role as a gang leader could have undermined the defense argument that Gonzales feared attack by the Bassetts, giving defense counsel a strategic reason for not introducing this evidence.

Second, even if the jury were to afford some credibility to these witnesses, there was evidence which was inconsistent with these witnesses' descriptions of Gonzales. Gonzales had left an unsecured shotgun and shells in the same room as his infant son. Drug paraphernalia including syringes were also found lying around the house. The jury could have seen these facts and Gonzales's self-described gang history as inconsistent with someone who was purportedly so concerned for the welfare of the children.

Third, this character evidence would have provided limited support for the conclusion that Gonzales did not know about the raid in advance. According to Gonzales, this evidence demonstrated that if he knew about the raid in advance and was planning on killing a police officer, he would have ensured that the children were not in the home at all. But that assumed that Gonzales was aware of exactly when the police officers would arrive and knew when the children needed to

be out of the house. The jury also could have thought that Gonzales merely did not think through his plan, or could have concluded that having the children in the house was part of Gonzales's plan to make the shooting look like an accident.

Finally, even if the jury did draw Gonzales's desired inference from this evidence and concluded based on the presence of the children that Gonzales did not have advance notice of the raid, the guilt phase jury could have convicted him even if they believed he did not have advance notice. The jury could also have found Gonzales guilty of first degree murder if they did not believe that Gonzales had advance notice, but did believe that he knew at the time of the shooting that the men were officers. If the jury convicted on this basis, the children being in the home would have been irrelevant.

2. Penalty Phase

Gonzales raises a similar claim in the context of the penalty phase, arguing that the failure of his lawyer to investigate and present character and background evidence during the penalty phase constituted ineffective assistance of counsel. The California Supreme Court rejected the claim because it found there was a valid strategic reason for not presenting character evidence. *Gonzalez*, 800 P.2d at 1197-1201. Once again, Gonzales must show that the California Supreme Court was unreasonable in reaching this conclusion. Gonzales cannot meet this requirement because he cannot show prejudice arising from the failure to present this evidence. *See Wong v. Belmontes*, ___ U.S. ___, 130 S. Ct. 383, 386 (2009) (prejudice requires a showing of "a reasonable probability that a competent attorney, aware of the available mitigating evidence, would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.") (internal quotation marks and alterations omitted)).

Gonzales points to two types of character evidence that he claims his attorney should have discovered and presented. The first type, already discussed in the context of the guilt phase, consisted of testimony by family, friends, neighbors, and a former teacher, all of whom described Gonzales as a kind person who was respectful of adults and caring towards children. However, as discussed above, this testimony was suspect because none of these witnesses were aware of Gonzales's drug and gang history. It is improbable that this evidence would have caused the jury to reach a different sentence.

More importantly, introduction of this evidence would have opened the door to evidence about allegations that Gonzales was involved in a gang rape in 1972. Gonzales had been accused of being involved in a gang rape but ultimately only pled guilty to a charge of misdemeanor battery on the victim's friend. Defense counsel was able to limit evidence of this incident during the penalty phase to a stipulation as to this conviction. Gonzales's attorney testified at the referee hearing that he did not develop or introduce character evidence because he was worried about the prosecution introducing additional details about the incident. The referee and the California Supreme Court found that had Gonzales raised the issue of his character, the prosecution would have been able to present the facts underlying the battery conviction.

While there was some evidence presented at the referee hearing that the rape victim would have denied that Gonzales had raped her, Gonzales still pled guilty to battery on the victim's friend. Therefore, the best Gonzales could have hoped for was a showing that he was not one of the rapists but did batter the victim's friend, and at worst the jury could have believed that Gonzales was involved in or assisted in allowing the rape. Given how weak the mitigating character evidence was, it was not unreasonable for the California Supreme Court to conclude that Gonzales's counsel had a valid strategic reason for not introducing the character evidence so as to avoid

the details of this incident. *See Burger v. Kemp*, 483 U.S. 776, 791 (1987) (concern about prior convictions was valid reason not to introduce character evidence); *Siripongs v. Calderon*, 133 F.3d 732, 736-37 (9th Cir. 1998) (same).

The second type of evidence was information about Gonzales's life history. The bulk of this testimony portrayed Gonzales's family as a stable lower-class family. The only potentially helpful information was that two of Gonzales's sisters died in a train accident when he was younger and that after this accident Gonzales's parents neglected the remaining children. This testimony came from Gonzales's aunt. Additionally, the defendant's brother testified that there was a change in the family after the death of his sisters. While it is unclear what these witnesses meant, it is conceivable that this evidence could have been presented to the jury to induce sympathy for Gonzales, and its introduction would not have opened the door to the gang rape evidence.

While this evidence could have been introduced, it was not the kind of evidence that would have made a sentencer "conclude[ ] that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Generally Gonzales appears to have come from a stable family. While Gonzales's aunt used the word "neglect," it does not appear that she means that the children were abandoned or abused. Furthermore, Gonzales was already sixteen when the accident occurred so it is questionable how much any neglect would have affected him. Additionally, there was no evidence of the kinds of abuse which other courts have found sufficiently material to warrant relief. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (evidence of abuse at hands of alcoholic absentee mother and "physical torment, sexual molestation, and repeated rape" while in foster care); *Boyde v. Brown*, 404 F.3d 1159, 1180 (9th Cir. 2005) (counsel was deficient for failing to investigate and present evidence of physical and sexual abuse by parents). While the death of his sisters was undoubtedly tragic and the shock may

have caused Gonzales's parents to be inattentive to him, this evidence was not sufficient to engender enough sympathy to overcome the aggravating circumstances of the murder.

**[15]** We conclude that the state court did not unreasonably determine that there was not a reasonable probability that had this evidence been presented to the jury the result would have been different. Since Gonzales failed to establish that the alleged deficiency by his counsel caused him prejudice, these ineffective assistance of counsel claims fail.

## C. Ineffective Assistance of Counsel: Mental Impairment Evidence

Gonzales also alleges that his counsel was deficient because he failed to investigate and present evidence at the guilt and penalty phases that Gonzales had a mental impairment that would have affected his judgment at the time of the shooting. Gonzales points to a medical opinion by Dr. Stein, a doctor retained by Gonzales's habeas counsel, which stated that Gonzales has a mental impairment which "would make it extremely difficult for him to choose between alternatives within a short period or to size up options available to him." Dr. Stein also opined that "[e]ven if Gonzales had heard the police officers announce themselves, it is highly likely he would have still tended to distort or misperceive the events and have been unable to grasp the correct response." *Id.* Gonzales asserts that this mental impairment evidence would have explained why, once he believed the men were Bassetts, he was unable to process the evidence that they were in fact officers.

The California Supreme Court rejected this claim because Gonzales had not shown that his counsel was deficient. In doing so it first determined that federal law contained "no blanket obligation to investigate possible 'mental' defenses." *Gonzalez*, 800 P.2d at 1195. Rather, an attorney only needs to investigate mental health defenses if there are "facts *known to*

*counsel* from which he reasonably should have suspected that a meritorious defense was available." *Id.* It then made a factual determination that counsel was not aware of any evidence that would have made "the possibility of convincing 'mental' evidence . . . *reasonably apparent* to a competent attorney." *Id*. In reviewing this conclusion we once again ask only "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 778. Here, there are reasonable arguments that counsel was not deficient. Because Gonzales has failed to satisfy his burden under the deficiency prong, there is no need to address the prejudice prong.

First, the California Supreme Court's determination that there is "no blanket obligation to investigate possible 'mental' defenses, even in a capital case" was not an unreasonable application of federal law. *Strickland* explicitly addresses counsel's duty to investigate, instructing that "counsel has a duty to make reasonable investigations *or to make a reasonable decision that makes particular investigations unnecessary.*" 466 U.S. at 691 (emphasis added); *see also Wiggins*, 539 U.S. at 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."); *Douglas v. Woodford*, 316 F.3d 1079, 1085 (9th Cir. 2003) ("Trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."). There is no clear Supreme Court case law always requiring a mental health investigation at the guilt or penalty phase. *See Pinholster*, 131 S. Ct. at 1406-07 ("*Strickland* itself rejected the notion that the same investigation will be required in every case."). The Court has generally eschewed blanket rules in the context of ineffective counsel. *Strickland*, 466 U.S. at 696 ("Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles we have stated do not establish mechanical rules.").

Second, the California Supreme Court's determination that counsel would not have been aware that a mental health investigation would lead to "materially favorable evidence," *Gonzalez*, 800 P.2d at 1195, was a reasonable factual determination. The only facts that Gonzales suggested should have put his counsel on notice was the fact that Gonzales was illiterate and that he had been sick as a child. The California Supreme Court requested a response from defense counsel as to why he failed to conduct a mental health investigation, and he explained that Gonzales "seemed normal and alert, and he participated knowledgeably in strategy discussions." *Id.* at 1194. In regards to Gonzales's illiteracy, counsel stated "he attached little significance to defendant's illiteracy, because poor reading skills are common in low-income communities for reasons unrelated to mental ability." *Id.* The California Supreme Court found counsel's responses uncontroverted and dispositive.

As *Strickland* requires, the California Supreme Court "evaluate[d] the conduct from the counsel's perspective at the time" and then "judge[d] the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." 466 U.S. at 689-90. Given that "counsel is strongly presumed to have rendered adequate assistance," *id.* at 690, the California Supreme Court was not unreasonable in accepting counsel's statement that from his perspective there was nothing unusual about Gonzales's illiteracy, in combination with other facts he knew about Gonzales, that would have required him to seek a mental health evaluation.

**[16]** Nor has Gonzales adequately explained why his illiteracy would have necessarily put his counsel on notice that a mental impairment defense would be fruitful. The fact that Gonzales appeared normal and alert and was able to participate in strategy discussions would have been much more relevant in considering whether to pursue a mental impairment investigation. We find nothing unreasonable with the state

court's conclusion that defense counsel did not have reason to believe that a mental health investigation would have been fruitful.[14]

## D. Ineffective Assistance of Counsel: Evidence that Acker was a Government Agent

Gonzales also argues that his counsel was ineffective for failing to investigate and present evidence that William Acker was a government agent. Inherent in this claim is the assumption that Acker was a government agent. However, despite having pursued this claim for close to thirty years, Gonzales has never been able to provide evidence to support his assertion that Acker was acting as a government agent. As the California Supreme Court correctly noted, "[a]bsent evidence of direct motivation by the police or a *prior* 'working relationship' between Acker and the authorities," there is no basis for concluding Acker was a government agent. *Gonzalez*, 800 P.2d at 1193.

Even after the discovery authorized by the district court, nothing in the record suggested that Acker had an established

---

[14]We also note that while Gonzales has presented this argument as one about a mental impairment investigation, it is actually an argument that counsel did not think of a potential avenue for supporting the defense's theory that Gonzales believed the officers were gang members. Just because counsel did not come up with all potential ways to prove the case does not make the counsel's performance ineffective. *See Richter*, 131 S. Ct. at 789 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."); *see also Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."); *Chandler v. United States*, 218 F.3d 1305, 1316 n. 16 (11th Cir. 2000) ("No lawyer can be expected to have considered all of the ways. If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on.").

relationship with the police prior to his conversations with Gonzales. Gonzales points to the fact that Acker also testified about jailhouse confessions in other murder cases and argues that it cannot be mere coincidence that Acker was placed next to several murder suspects who all purportedly confessed to him. He also suggests that there was something unusual going on because Acker was referred for a probation evaluation even though he should not have been eligible for probation on his murder conviction.

**[17]** Conjecture and coincidences cannot stand in the stead of actual evidence that Acker was a government agent, however, particularly given the high standard of deference given to the state court's conclusion. We agree with the district court that "petitioner has not presented, and cannot come up with, clear and convincing evidence to controvert, or rebut the presumption of correctness applicable to, the state court's finding that Acker did not act as law enforcement's agent in petitioner's case." Because there is no evidence that Acker was a government agent, there is no basis to find that the conclusion reached by the California Supreme Court on this claim was factually or legally unreasonable.

### E.  Ineffective Assistance of Counsel: Lingering Doubt

Gonzales next argues that his counsel provided ineffective assistance during the penalty phase because his counsel failed to understand and explain to the jury the one mitigating factor he presented to the jury, "lingering doubt."[15] Lingering doubt

---

[15]The California Supreme Court did not explicitly address this argument as an ineffective assistance of counsel argument. It did reject an argument that the jury was misled to ignore any lingering doubt in the penalty phase through either counsels' arguments or the jury instructions. This is, in essence, a conclusion that either counsel was not deficient or that any deficiency was immaterial. *Gonzalez*, 800 P.2d at 1189. It also rejected several unspecified ineffective assistance claims, which the court describes as including "incompetently fail[ing] to . . . present mitigating penalty evi-

was a valid mitigating factor recognized by the California Supreme Court in *People v. Terry*, 390 P.2d 381, 387 (Cal. 1964). Lingering doubt is some doubt regarding the defendant's guilt for the crime of conviction, less than reasonable doubt but preventing absolute certainty, which mitigates against imposing the death penalty.

Defense counsel did try to create lingering doubt by presenting evidence during the penalty phase to support the theory that Gonzales had mistakenly believed the police were gang members. However, in his opening and closing statements, defense counsel made confusing statements that suggested that the jury could not consider whether they had doubt about Gonzales's guilt. While counsel's performance might have been less than stellar, his statements about lingering doubt did not have a material adverse effect on the penalty phase.

The prosecutor focused his case for aggravation almost exclusively on one aggravating factor, "the aggravated nature of the crime." The state sought to establish this factor by proving that Gonzales knew about the raid in advance and planned to use the raid as an opportunity to "bag a cop." In his opening statement during the penalty phase trial that produced the death sentence verdict, the prosecutor told the jury that "the evidence will show that the defendant planned to kill a cop. Not that it was thought of lightly, that it was just a split-second situation, spontaneous, but he planned to kill a cop. Something to the effect he was going to bag a cop." Dur-

---

dence" and making "tactical errors at the penalty phase affect[ing] the balance of aggravation." *Id.* at 1202. Gonzales exhausted the issue because his petition before the California Supreme Court clearly raised this issue as one of ineffective assistance of counsel. California Amended Petition at 65-6. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 131 S. Ct. at 784.

ing his summation the prosecutor reiterated that the murder deserved the death penalty because Gonzales "planned to kill a cop during a raid," had "a detailed Bassett story to show how he was going to cover it up," and was "standing there with a shotgun, lying in wait." The prosecution's penalty phase case rested on proving the "bag a cop" theory.

**[18]** Having reached the conclusion that Gonzales's crime warranted the death penalty, the jury necessarily found that the aggravating circumstances outweighed the mitigating ones. Given the prosecutor's arguments, it is highly likely that they concluded there was a premeditated plan to "bag a cop." Having reached this conclusion, they also necessarily rejected the argument that would have created lingering doubt, that Gonzales mistakenly believed the officers were gang members. Therefore, it was not unreasonable for the California Supreme Court to conclude that any deficiency in defense counsel's lingering doubt argument was immaterial.

## F.   Prosecutorial Misconduct: False Testimony by Acker

Gonzales also claims that the prosecution used false testimony by Acker. Gonzales alleges that Acker lied about his reasons for testifying against Gonzales. It is clearly established law that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction . . . ." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The California Supreme Court applied this law and rejected this claim. It concluded that while there may have been inconsistencies in Acker's testimony, "one cannot state a prima facie case of perjury or concealment simply by showing inconsistencies in the witness's testimony." *Gonzalez*, 800 P.2d at 1194. The California Supreme Court also rejected Gonzales's contention that Acker perjured himself at the guilt trial by not mentioning that the state had paid for him to have one of his tattoos removed. The court noted that "any inference that Acker had received benefits for his cooperation in this and other cases *by the time of the second penalty trial*

does not establish that his contrary guilt phase testimony was false *when given*." *Id.* at 1174. Given the evidence before the court, this conclusion was reasonable.

The exact nature of Gonzales's claim before this court is not entirely clear, but it appears to be that the California Supreme Court denied this claim without allowing him the opportunity to engage in the discovery necessary to support it. However, Gonzales was given the opportunity to conduct discovery into this claim by the district court and failed to uncover any evidence demonstrating the prosecutors knowingly allowed Acker to lie during his testimony. Once again, conjecture and coincidence cannot win the day, particularly given the deference due the state court's conclusions. Absent such evidence, there is no reason to question the California Supreme Court's conclusion that the claim is meritless.

## G.   *Hicks Claims*

**[19]** Gonzales next claims that his federal due process rights were violated by statements made by the prosecutor during his closing argument for the penalty phase. Gonzales points to three types of statements: instructing the jurors that they should not consider sympathy, discussing the jury's discretion to impose the death penalty if it found the aggravating circumstances outweighed the mitigating circumstances, and suggesting the absence of a mitigating circumstance be treated as an aggravating circumstance.

Gonzales is unable to point to any clearly established federal law from the Supreme Court that establishes any of these statements as a deprivation of due process under federal law, as required by the AEDPA. Instead, Gonzales has argued that the prosecutor's statements were in violation of state law and that in making these statements the prosecutor violated his constitutional right to have the jury exercise its discretion in the manner authorized by state law. He derives this principle from *Hicks v. Oklahoma*, 447 U.S. 343 (1980), which held

that if a state guaranteed a defendant the right to have a jury decide his sentence, it was unconstitutional to deny him re-sentencing by a jury after the statute under which he was sentenced was deemed unconstitutional. The Court stated that:

> Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion.

*Id* at 346.

Gonzales reads *Hicks* too broadly. *See Chambers v. Bowersox*, 157 F.3d 560, 565 (8th Cir. 1998) (distinguishing *Hicks* and "reject[ing] the notion that every trial error, even every trial error occurring during the sentencing phase of a capital case, gives rise to a claim under the Due Process Clause"). In *Hicks* the defendant was denied his state law right to have a jury decide his punishment, which implicated issues of fundamental fairness. *Hicks* was not concerned with how a jury exercised its discretion. Here, regardless of the prosecutor's statements, the decision to impose death was still made, as required by state law, by a jury in the "exercise of its statutory discretion."

Moreover, Gonzales's argument also fails because it relies on the erroneous conclusion that he was denied a right guaranteed to him by state law. *See Ross v. Oklahoma*, 487 U.S. 81, 91 (1988) (rejecting *Hicks* challenge because defendant "received all that was due under [state] law"). Gonzales raised each of these claims as independent state law claims before the California Supreme Court. That court found no violation of state law in any of the prosecutor's statements. *See*

*McSherry v. Block*, 880 F.2d 1049, 1052 (9th Cir. 1989) ("We are bound by th[e] state court's construction of its own penal statute.").

Finally, even if there was error, it was not enough to establish a denial of due process. That requires a showing of a denial of "that fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236 (1941). This is not a case where "the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

## H.    Bouie Claim

[20] Gonzales next claims a violation of his due process rights under *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). In *Bouie* the Court applied the underlying concept of the *ex post facto* clause of the Constitution, which on its face only applies to legislative acts, to the judiciary. It held that just as the *ex post facto* clause prohibits punishing an individual under a law that was not in effect at the time of the person's actions, the due process clause protects against "unforeseeable judicial enlargement of a criminal statute." *Id.* In other words, a court cannot reinterpret a criminal statute in an unforeseeable manner so that it criminalizes additional conduct and then apply that novel interpretation retroactively. We have considered Gonzales's *Bouie* claim and conclude that there was no due process violation.

Gonzales's claim arises out of the manner in which the jury was instructed on the special circumstance of which he was convicted: killing a peace officer engaged in the lawful performance of his duties. The trial court modified the instruction on the special circumstance so that the jury was instructed that a police officer serving a search warrant was engaged in the

performance of his duties.[16] Gonzales did not object to this instruction during trial, but in his direct appeal to the California Supreme Court he argued that the modification violated established California law. He contended that under California law an officer serving a facially valid, but actually invalid warrant was not engaged in the lawful performance of his duties and that the validity of the warrant was a question for the jury to decide. He argued the court erred by telling the jury that an officer serving a search warrant was automatically engaged in the performance of his duties, because in doing so it prevented the jury from making its own determination about the warrant's validity.

Gonzales's argument relied on the California Supreme Court's holding in *People v. Curtis*, 450 P.2d 33 (Cal. 1969), that in order to be convicted of a crime with an element involving physical force against an officer the jury had to find that the officer was lawfully engaged in his duties. A footnote in *Curtis* suggested that an officer serving an invalid warrant was not lawfully performing his duties. *Id.* at 37 n.4. However, the court had never explicitly held that an officer was not engaged in the performance of his duties if he was serving a facial valid but actually invalid warrant.

The California Supreme Court rejected Gonzales's argument, and held for the first time, over a dissent, that "if a warrant is valid on its face, an officer carrying out its command to search or arrest is lawfully engaged in duty . . . even if the facts disclosed to the magistrate in support of the warrant were not legally sufficient to establish probable cause." *Gonzalez*, 800 P.2d at 1177. Because federal courts will not consider issues of state law as part of habeas review, Gonzales

---

[16]The instruction in question, with the modification in brackets, defined "performance of his duties" as "any lawful act of conduct while engaging in the maintenance of the peace and security of the community or in the investigation or prevention of a crime; [to wit, the serving of a search warrant]."

attempted to repackage this claim as a violation of federal due process. He argued that *Curtis* was the law at the time of his crime and that the California Supreme Court's decision in his appeal was an unforeseeable enlargement of a criminal statute that was retroactively applied to him in violation of due process as established in *Bouie*.

There are several problems with Gonzales's *Bouie* argument. First, the California Supreme Court's decision in *Gonzalez* was not unforeseeable. In fact, we think it unlikely that the court would have reached any other conclusion. To do so would have sanctioned violence against law enforcement officers who believed they were lawfully performing their jobs. *Curtis*, which dealt with an officer making an unlawful arrest and using excessive force, was clearly directed at denying officers who were knowingly engaging in unlawful exercises of police power the extra protection of criminal statutes like the special circumstance at issue here. The dicta in the footnote, while suggesting that a warrant must be actually valid, is a broad, general statement which was not controlling law.

Even if we thought the California Supreme Court's decision was unforeseeable, we do not believe that *Bouie* is applicable here. *Bouie* dealt with the reinterpretation of a criminal statute such that conduct that at the time would not be criminal was later held, after the fact, to be criminal under the statute. In *Bouie*, the South Carolina Supreme Court reinterpreted a trespassing statute that had previously been interpreted to only criminalize unlawful entry to, in addition, also criminalize remaining on property after being asked to leave. It then retroactively applied that new interpretation to civil rights demonstrators who had been charged with trespassing because they had refused to leave a restaurant where they were holding a sit-in. The Supreme Court held this interpretation to violate the due process clause because at the time the defendants acted their conduct was not criminal and they had no notice that their actions were illegal. *Bouie*, 378 U.S. at 362

Applying *Bouie* here would not further the principle under-lying that decision. The theory behind *Bouie* was that judicial enlargement of a criminal statute, like an *ex post facto* law, fails to give a defendant adequate notice that his conduct is criminal. *Id.* at 350 (discussing principle that "a criminal stat-ute must give fair warning of the conduct that it makes a crime"). Here the court's ruling had nothing to do with the defendant's actions, but instead had to do with the victim's status. An individual who sees an officer serving a warrant would not ordinarily know at the time that the warrant was not valid. There is no suggestion that Gonzales knew that the search warrant was invalid or was justified in resisting it on that basis by shooting the officer attempting to serve it. Prior to *Gonzalez,* someone who shot an officer in the process of serving a warrant had notice that he may be subject to the death penalty. *Bouie*'s concern with fair notice to the defen-dant is inapplicable here.

Finally, even if we found *Bouie* applicable here, the alleged error was harmless. On habeas review the "substantial and injurious effect" standard applies to determine whether a con-stitutional error was harmless. *Fry v. Pliler*, 551 U.S. 112, 121 (2007). Gonzales challenged the validity of the warrant on appeal and the California Supreme Court held that "[b]y any applicable standard, the warrant was valid." *Gonzalez*, 800 P.2d at 1169. During the trial Gonzales never contended that the warrant was invalid and never introduced any evidence that would have cast doubt on its validity.[17] Based on the evi-dence presented at trial, there was no basis for the jury to con-

---

[17]Justice Mosk stated in his *Gonzalez* dissent that Gonzales presented evidence and argument that the police acted unlawfully when they broke into the residence to execute the warrant. *Gonzalez*, 800 P.2d at 1210 (Mosk, J., dissenting). However Justice Mosk was not discussing the validity of the search warrant, but rather the means of entry, which is not at issue in this appeal. Furthermore Justice Mosk appears to have been mistaken; we can find no evidence that during trial the defense argued the officers' entry into the house was unlawful. In fact defense counsel stated that he was not going to challenge that the officers knocked and announced themselves. Gonzales also evidently raised some arguments before the district court that the warrant was invalid, such "as differing heights and times between the warrant affidavit and the underlying arrest report." Assuming, arguendo, that these alleged deficiencies could make the warrant invalid, these arguments were not made at trial.

clude the officers were not acting pursuant to their official
duties. Therefore, there is no reason to believe the changed
language affected the outcome of the trial. Since any error
would have been harmless, Gonzales's *Bouie* argument would
fail regardless of its legal merit.

## III.    Response to Partial Dissent

The partial dissent disagrees with the portion of our deci-
sion that remands the *Brady* claim based on the psychological
reports to the district court with instructions to stay the habeas
proceedings until Gonzales has had an opportunity to present
this new evidence to the California Supreme Court. Disagree-
ment is expressed on both factual and legal grounds.

Factually, the partial dissent disputes our assessment of the
impact of the psychiatric reports withheld from defense coun-
sel, concluding that "[a]t most, these reports suggest that
Acker has an antisocial personality and that he tries to manip-
ulate the prison system to obtain transfers to his preferred
place of detention." Partial Dissent, at 20770. That character-
ization appears to us to be a substantial understatement, as
demonstrated by the description of those reports set out
above, at 20706-09. We also disagree with the partial dis-
sent's view that the withheld documents were not material
because Acker had already been sufficiently impeached, as
discussed at 20709-12. For the reasons discussed in more
detail at 20712-14, we conclude there was a reasonable possi-
bility that the verdict might have been different if the evi-
dence had not been withheld.

The disagreement as to law is more significant. The partial
dissent describes our decision as "an end run around *Pinhol-
ster*'s holding from (1) a hypothetical problem cited in its dis-
sent, (2) a hypothetical solution posed in a concurrence, (3) a
footnote in the majority opinion responding to both, and (4)
an incredibly broad definition of the word 'claim.' " Partial
Dissent, at 20734.

The last comment is especially puzzling, because we do not adopt a "broad" definition of the word "claim." We conclude that Gonzales had not presented a new "claim" distinct from claim already presented and rejected by the California Supreme Court, *see* above at 20701-02, though at a time when that court was not aware of the psychiatric reports withheld from the defense. Judge Fletcher's separate concurring opinion raises the suggestion that this argument could be identified as a "new claim," but that is not a conclusion of the majority opinion.

More broadly, the partial dissent reads *Pinholster* to say something which the majority of the Court explicitly declined to say. The discussion which the partial dissent describes as "hypothetical" appears to us to concern precisely the situation presented to us in this case: "new evidence of withheld exculpatory witness statements." *Pinholster*, 131 S. Ct. at 1401 n.10. If there were compelling evidence of that nature, the partial dissent would apparently have us disregard it, nonetheless..

The partial dissent does not fault petitioner for failing to discover the withheld information or for failing to include it in his previous petition to the California Supreme Court, and properly so. Gonzales can't be blamed for not knowing or presenting to the state court what was withheld from him.

The only fault found by the partial dissent is that, in its view, by not immediately requesting a stay and seeking to return to state court after learning of the psychological reports in 2003, Gonzales "engaged in intentionally dilatory litigation tactics." Partial Dissent at 20776. But prior to the announcement of the Court's decision in *Pinholster* earlier this year, there did not appear to be any barrier to Gonzales pursuing his argument in federal court. *Pinholster* reversed a decision of this court, and the law in this circuit prior to that reversal did not require or even suggest that Gonzales should have done what the partial dissent castigates him for not doing. By the

time of the Court's decision in *Pinholster* was announced, Gonzales's appeal had already been submitted to our panel for decision, so at that point there was nothing else for him to do.

Staying the proceeding in federal court to give Gonzales an opportunity to present the previously withheld material to the California Supreme Court is a sensible solution to the problem posed by this case. Indeed, we note that even the State, in supplemental briefing after oral argument of this case, suggested that we should return the case to state court to let it decide on the significance of the withheld information. That suggestion appears reasonable to us.

We doubt that the stay and abey process will have to be employed very often, because *Pinholster* is now the recognized law, and because there should not be many such instances of withheld exculpatory witness statements not discovered until years later, after state court proceedings have concluded. But to disregard that evidence in the situation presented by this case would be to reward the prosecution for successfully withholding the evidence in the first place. We cannot accept such an unjust and illogical result, and we do not believe that is what the law requires.

## IV.   Conclusion

We affirm all of the district court's rulings on all of the non-*Brady* claims. However, because we believe that with the new evidence of the psychological reports Gonzales could make a colorable *Brady* claim, we remand to the district court on this claim (along with the related ineffective assistance claim) with instructions to stay the habeas proceedings until Gonzales has had an opportunity to present this new evidence to the California Supreme Court.

**AFFIRMED in PART; REVERSED and REMANDED in PART.**

W.   FLETCHER, Circuit Judge, concurring in part:

I concur fully in Judge Clifton's analysis of Gonzales's non-*Brady* claims.

I also concur in the decision to remand to the district court with directions to stay and abey Gonzales's federal habeas petition in order to allow him to present to the California state courts his claim under *Brady v. Maryland*, 373 U.S. 83 (1963), based on the evidence he has obtained during discovery in his federal habeas proceedings. However, I believe that we have the authority, in the circumstances of this case, consistent with the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), to decide petitioner's *Brady* claim now, without first seeking the view of the California courts. I would prefer to exercise that authority.

## I.   General Application of *Pinholster*

The Supreme Court held in *Pinholster* that in a habeas case governed by 28 U.S.C. § 2254(d)(1) we generally cannot consider evidence that was not before the state court. *Pinholster*, 131 S. Ct. at 1398. A question *Pinholster* does not answer is what federal courts should do when confronted with such evidence. I agree with Judge Clifton that we may treat such evidence in the same way we treat unexhausted claims.

In *Rhines v. Weber*, 544 U.S. 269 (2005), the Supreme Court held that when a habeas petitioner files a so-called "mixed" habeas petition — a petition that includes both exhausted and unexhausted claims — a district court abuses its discretion in certain circumstances when it decides not to stay and abey the petition to allow the petitioner to present the unexhausted claims in state court. Specifically, a district court should stay and abey such a mixed petition if "the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation

tactics." *Id.* at 278. The Court reasoned that if district courts did not stay and abey such mixed petitions, the one-year statute of limitations in AEDPA would bar petitioners from obtaining federal review of the unexhausted claims. *See id.* at 275. Restricting the stay and abeyance procedure to situations where petitioners have good cause for failure to exhaust, have potentially meritorious claims, and have not engaged in dilatory tactics, protects "AEDPA's objective of encouraging finality." *Id.* at 277.

The same reasoning applies here. If a habeas petitioner discovers new evidence supporting a claim of a constitutional violation after he has filed a federal habeas petition, and the district court adjudicates that claim without the benefit of the new evidence, then the ban on second or successive petitions in 28 U.S.C. § 2244 will usually bar the petitioner from ever having his full claim adjudicated in federal court. I agree with Judge Clifton that, so long as the petitioner had good cause for his failure to discover the evidence while before the state court, the claim based on the new evidence is potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics, the district court should stay and abey the claim supported by the new evidence to allow the petitioner to present that evidence to the state court. I also agree with the application of *Rhines* to the facts of this case.

If this were an application of *Pinholster* to an ordinary case, I would simply agree with Judge Clifton's opinion and not write separately.

## II.   General Rule of *Pinholster* Does Not Apply

This, however, is not an ordinary case. The facts of this case are so extreme that the federal courts have the power, consistent with *Pinholster*, to consider the *Brady* material now, without first requiring Gonzales to seek the view of the state courts.

The prosecutors actively suppressed evidence concerning William Acker, the witness who gave the only evidence of the state's primary aggravating factor at Gonzales's capital trial. The California trial court on post-conviction review granted a discovery motion that would have revealed the suppressed evidence. But the California Supreme Court reversed the trial court's discovery order and refused to enter one of its own. The suppressed evidence shows not only that Acker was a jailhouse informant expecting to receive advantageous treatment in return for his testimony. Acker was also, unbeknownst to Gonzales and his attorneys, a schizophrenic who had repeatedly faked suicide attempts to obtain desired prison transfers; had attempted to bribe a prison psychologist for a good report; had previously said that he was turning his life around in order to obtain release from prison, but had committed thefts and a first-degree murder upon his release, before testifying at Gonzales's trial that he was testifying as part of an effort to turn his life around; and had earlier been described by state correctional officers as "considered capable of any measure of brutality in the service of achieving what he wants to do."

I explain below the procedural history of Gonzales's Brady claim, and why, given that history, *Pinholster* does not prevent us from deciding that claim now.

## A.   Acker's Role at Trial

Judge Clifton accurately describes the events of Gonzales's trial. I provide more detail to show fully Acker's importance to the state's case against Gonzales, and the extent to which Acker was — or, more accurately, was not — impeached at trial.

### 1.   Acker's Substantive Testimony

Gonzales's conviction was based on his murder of a police officer. The officer was part of a team conducting a drug raid

of Gonzales's parents' home. When the police entered, Gonzales was braced against a wall pointing a shotgun at the door. He fired and killed one of the officers. Gonzales's guilt-phase defense was that he thought the people entering his house were not police, but rather were members of the rival Bassett gang.

The prosecution's evidence supported two somewhat different stories. The first was that Gonzales must have known, based on the facts on the day of the raid, that the people breaking open his parents' front door were police officers. As Judge Clifton describes, the police officers testified that they repeatedly announced they were police before entering and that they had entered the house with their badges visible. Another officer with expertise in gang activity testified that the area where Gonzales's parents lived did not have a high level of gang activity, that the gang activity that did take place consisted of drive-by shootings rather than home invasions, and that a typical member of the Bassett gang looked and dressed nothing like the plain-clothes officers who conducted the raid. This evidence suggested it was unlikely that Gonzales mistook the plain-clothes officers for members of the Bassett gang.

The second story was that Gonzales had been told in advance that the police were coming to conduct the raid, and that he had formed, well in advance of the raid, an intent to kill a police officer. This story, obviously much more damning to Gonzales, came entirely from the testimony of William Acker. Acker was a jailhouse informant. Acker's story was generally consistent through Gonzales's guilt trial, first penalty-phase trial, and second penalty-phase trial. Acker testified that Gonzales had approached him while they were in prison cells in the same row shortly after Gonzales was arrested. Acker testified that in discussions during the next two weeks, Gonzales told him the details of his crime. According to Acker, Gonzales told him that he had been tipped off by a friend that the police were going to raid his

house. Gonzales thus knew the police were coming and was "on point" all day waiting, in Acker's words, to "bag a cop." According to Acker, Gonzales "knew it was a cop. He knew he was going to kill one. He aimed to kill." Acker testified that when he asked Gonzales why he was so determined to kill a police officer, Gonzales described to him "a real sick philosophy about how to protect the pad." Gonzales wanted to shoot a cop because "[t]hey got that coming." Acker also testified that Gonzales had told him that his defense strategy would be to claim that he thought the police officers were members of the Bassett gang.

## 2.    Acker's Importance

Acker's testimony was important in the guilt phase because, if believed, it demonstrated that Gonzales knew well in advance of the raid that the men conducting the raid were police officers. However, all the prosecution needed to show in the guilt phase was that Gonzales knew that the men were police officers at the time he fired. Acker's testimony was thus useful but not essential to the guilty verdict. In the penalty phase, however, Acker provided the crucial testimony. In arguing why Gonzales deserved the death penalty, the prosecution's main theory of aggravation was that Gonzales had planned in advance to "bag a cop." In his opening statement in the second penalty-phase trial, Ronald Bowers, the prosecutor, said that "the evidence will show that the defendant planned to kill a cop. Not that it was thought of lightly, that it was just a split-second situation, spontaneous, but he planned to kill a cop. Something to the effect he was going to bag a cop." The evidence that Gonzales had planned in advance to kill a police officer came only from Acker, and the expression "bag a cop" came only from Acker. In his closing statement, Bowers's chronology of when and how Gonzales formulated his plan to "bag a cop" came entirely from Acker's testimony.

Acker's importance in the penalty phase is also demonstrated by a memorandum Bowers wrote to his supervisor

after Gonzales's first penalty-phase trial resulted in a mistrial. The jury, which consisted of six men and six women, had hung with nine in favor of death and three in favor of life without parole. Bowers wrote:

> I talked to the jurors afterwards and most of them found William Acker's testimony to be credible. It was interesting that the women (especially the younger women) were totally convinced by Acker's statements. Some of the men only partially believed what he said. I hope to retry the penalty phase if downtown approves the retrial and Bill Acker is available and is willing to testify.

This memorandum makes clear that Bowers was not willing to retry the penalty phase without Acker. It further suggests that women were more likely to believe Acker. The jury in the second penalty-phase trial had eleven women and one man. Gonzales's trial took place before the Supreme Court decided *J.E.B. v. Alabama*, 511 U.S. 127 (1994), and it was thus permissible for the prosecutor to seek women on the jury.

Attacking Acker's truthfulness was crucial to the penalty-phase defense strategy. Ralph Bencangey, Gonzales's lawyer, decided not to attack the guilt-phase jury's conclusion that at the time he fired the gun Gonzales knew the men were police officers, but to rather attack Acker's testimony that Gonzales had planned in advance the murder of a police officer. Bencangey told the second penalty-phase jury that the guilt-phase jury "could well have thought that at the time it occurred and the way that it occurred, [Gonazales] should have known that they were police officers at that time rather than . . . a long period in advance." Bencangey told the jury in his opening statement that he would show that "if [Gonzales] is guilty, as the jury has previously stated, it would not be based on some advance plan that the prosecution is talking about, some special plan to kill a police officer." Bencangey made this same argument in his closing.

To succeed with this strategy, it was crucial to impeach Acker. In his opening statement Bencangey said that "the People are asking for a death penalty verdict, really based on the absolute truth of everything that Mr. Acker has said. It must be absolutely true."

### 3. Impeachment of Acker

Over the course of one guilt-phase trial and two penalty-phase trials, the prosecution disclosed only two documents concerning Acker to the defense: Acker's rap sheet and a transcript of Acker's initial statement to investigators. The rap sheet was incomplete and inaccurate. It included several property crimes and Acker's conviction for first-degree murder. But it failed to include several of Acker's convictions, and it incorrectly stated that Acker was sentenced to life without parole for the murder when he was actually sentenced to life with possibility of parole. Acker's initial statement to investigators provided no impeachment material because Acker told them basically the same story he later told at trial.

Bencangey was thus severely limited in his ability to impeach Acker. During cross-examination in the guilt-phase trial, Acker admitted he was hopeful that in exchange for his testimony he would be transferred to an out-of-state prison. He said he was interested in such a transfer because he hated gangs, and the gangs hated him in return. Acker also admitted that he had given information to the police about crimes on two prior occasions. First, he gave information about his wife's involvement in a murder that he and his wife had committed in Hawaii. Second, he spoke with the police about a murder that had taken place on his row in jail. Everyone on his row, however, had been required to speak to the police about that murder.

By the time of the first penalty-phase trial, Acker had given information in several more cases. In addition to having given information about his wife and the jailhouse murder, Acker

admitted giving information to the police in the cases of four other criminal defendants: Anthony Davis, Raymond LaScola, Edwin Guy Williams, and Johnny Torres. In violation of *Brady*, the prosecutor had not disclosed to Gonzales Acker's involvement in these cases. Bencangey had nonetheless learned of Acker's involvement when he discovered the transcript of Acker's testimony in the preliminary hearing in the LaScola case. In all four of the cases, Acker claimed the defendant confessed to him. In some of them, Acker testified in court, and in some he only spoke to the police. Although Bencangey did not know it during trial, we now know that the LaScola case was dropped because then-Head Deputy District Attorney (now our colleague) Stephen Trott had concluded that Acker was an unreliable witness. Judge Trott's view, expressed in a deposition taken in connection with Gonzales's federal habeas petition, was that Acker's testimony was "certainly nothing that a jury ever should rely on if that's all there was to convict Dr. La Scola." Judge Trott described Acker as a "classic psychopath" and "a truly evil guy who delighted in sticking guns in people's mouths to try to get them to, quote, 'crap in their pants.' "

To justify his practice of informing, Acker testified that not only was he giving information in order to obtain a transfer to an out-of-state prison, but he was also seeking a new "moral balance." He testified that he wanted to "do something right for a change, to do something real." "I'm trying to balance out the wrong that I've been through, you know, stop somebody else from going out and killing someone again."

In the second penalty-phase trial, Acker again discussed the information he had provided in the other cases, and he discussed his involvement in yet another case. He again testified that his reason for providing this information was both his desire to transfer to an out-of-state prison and his desire to "start a different direction for myself." Before the second penalty-phase trial, Bencangey had discovered that the state had promised Acker that they would remove a tattoo from his

back that read "Paramount." When Bencangey attempted to question Acker about the tattoo, Bowers objected. In a conference with the judge, Bowers said he wanted to prevent questioning about Acker's tattoo because "we have tried to change the identity of this informant, for his own safety." Bencangey replied that "up until this hearing, until I found out, I'd asked that witness if anything else was offered to him in exchange for his testimony, and the district attorney's office has never been forthcoming in telling me that they had promised to change his identity and surgically remove tattoos off him and give him a different name. I've only found this out recently."

The trial judge allowed Bencangey to question Acker about the tattoo. Bencangey attempted to impeach Acker by suggesting that the tattoo was a symbol of Acker's gang membership, and that the tattoo removal and the identity change was another part of what the state had offered him in exchange for testifying. Acker denied that he was in a gang, claiming that he had the tattoo to represent that he was from the city of Paramount.

The second penalty-phase jury, consisting of eleven women and one man, returned a unanimous verdict in favor of death.

B.    Report of the 1989-90 Los Angeles County Grand Jury

Gonzales was sentenced to death in May 1981. In October 1988, Los Angeles Sheriff's Department deputies learned that a jailhouse informant, Leslie White, was writing an article in which he planned to explain how informants were acquiring knowledge about defendants they had never met in order to fabricate those defendants' confessions. Report of the 1989-90 Los Angeles County Grand Jury, June 26, 1990, at 69 [hereinafter "Grand Jury Report"]. White agreed to demonstrate the technique to the Sheriff's Department. The report of what White did is worth repeating in full. The report does not identify White by name, but refers to him as "the informant."

The sergeant gave the informant the name of an inmate who was being held in the Hall of Justice Jail on murder charges. The informant, representing himself to be an employee of a bail bond company, called the jail's Inmate Reception Center and was able to obtain the inmate's booking number, date of birth, color of eyes and hair, height, weight, race (Caucasian), bail ($100,000), case number, date of arrest, arresting agency (Sheriff's Special Enforcement Bureau), next court date, and where the inmate was housed in the jail.

The informant next called the records section of the District Attorney's Office. He said he was a Deputy District Attorney and asked for information on the inmate's case. He was given the name of the Deputy District Attorney prosecuting the case, the Deputy District Attorney's telephone number, and the name of a witness.

A few calls later, the informant called Sheriff's Homicide and said he was "Sergeant Stevens" at the Central Jail. He was able to obtain the name of the murder victim, and the victim's age and race.

The informant then called the Deputy District Attorney who was handling the case, initially identifying himself as "Sergeant Williams" with the Los Angeles Police Department. The Deputy District Attorney responded to the informant's questions by stating, "I'll tell you anything you want to know about the case," and proceeded to provide details about what the victim was wearing, where his body was found, the fact that the coroner's report said that death resulted from suffocation and/or drugs, that the victim's blood contained a fatally high amount of methamphetamine, that the defendant confessed to stuffing the victim in a trunk, and the prosecutor's

personal opinion of the likely defense in the case. Near the end of the conversation, the informant gave his name as "Sergeant Johnson."

At this point, the informant said he had obtained enough details about the case to enable him to fabricate a jail house confession which would be accepted by detectives. He then proceeded to demonstrate how he could arrange for contact between himself and the inmate to support the fabricated confession.

The informant called a department of the Superior Court in Van Nuys, identifying himself as Deputy District Attorney "Michaels" with the Organized Crime Unit downtown. In response to the informant's request, the court bailiff ordered the informant and the inmate to be transported to Van Nuys the following day.

*Id.* at 69-71. White indicated that a fabricated confession based on this information would be sufficient to get him a "hell of a deal" with prosecutors. *Id.* at 71. His information was believable both because he knew many facts about the defendant that he apparently could only have obtained from the defendant, and because he had arranged to be in the same place as the defendant so that it was possible that the defendant could have confessed to him. White said that the "key" to the operation is that the District Attorneys

want to win. So if I come forward with the information as detailed as that they're gonna use it. Because the jury not knowing the system or how it works, is going to believe when I get up there with all these details and facts, that this guy sat in the jail cell, or he sat on the bus, or he sat in the holding tank somewhere, or told me through a door or something, they're gonna believe me.

*Id.* at 72.

White's demonstration led to the empanelling of an investigatory Grand Jury to look into the improper use of informant testimony by the Los Angeles County District Attorney's Office. The Grand Jury's investigation took place between 1989 and 1990, and covered the period from 1979 through 1990. The grand jurors and their investigators spoke to twenty-five informants. The Grand Jury concluded that "the experiences and perceptions of these informants generally reflect those of the informant population at large." *Id.* at 8. The grand jurors also spoke to and heard testimony from a large number of people in the Los Angeles County Sheriff's Department (which administers the jails where the informants were housed), the Los Angeles District Attorney's Office, and the defense bar. The Grand Jury's 150-page report paints a harrowing picture of the role of jailhouse informants in the Los Angeles County criminal justice system during this period.

The report gave a detailed description of jailhouse informants' "astonishing ability to discover information about crime in order to concoct a confession by another inmate." *Id.* at 31. Credibility of jailhouse informants is often based on the supposed fact that they could only have obtained certain information about a crime from the defendant himself. The report describes cases in which law enforcement officers either fed information about other inmates to informants, or left informants in a room with documents from other inmates' cases. *Id.* at 27-28. Sometimes law enforcement officials would signify to informants that a new inmate was "hot," thereby giving the informants an implicit instruction to provide testimony inculpating the inmate. Informants would sometimes obtain information by getting friends who were not incarcerated to go to a defendant's preliminary hearing and get information, or would simply get unwitting defendants to describe crimes. In one case, a defendant described to an informant a crime he had witnessed, but not committed, and

the informant turned it into a confession. *Id.* at 30. Often informants would "offer to assist [a] defendant in his case and thereby elicit the defendant's knowledge of law enforcement's version of the crime." *Id.* at 31 n.16.

The Grand Jury found that the Sheriff's Department facilitated informants' collection of information by placing informants near defendants from whom it wanted a confession. According to the Grand Jury:

> It has long been suspected that Sheriff's Department deputies intentionally placed informants with inmates "from whom law enforcement could use a confession." The Sheriff's Department denies such a practice has ever existed, however, the Grand Jury received evidence which indicated the placing of inmates for the purpose of gathering information has occurred.

*Id.* at 58 (quoting letter of Nov. 1, 1988, from a supervisory Deputy District Attorney to the District Attorney's Director of Bureau, Branch and Area Operations). The Grand Jury went on to describe numerous instances in which it concluded that informants had been placed near defendants from whom authorities wanted confessions. *Id.* at 60-68.

In addition to their ability to discover information about defendants, the informants had no scruples about perjuring themselves.

> An appalling number of instances of perjury or other falsifications to law enforcement during the past ten years were described by informants. Undeniably, a significant number of informants do not tend to feel constrained by external or internal values to refrain from lying, regardless of the consequences to other inmates.

*Id.* at 18-19. One informant confessed in the mid-1970s to a crime he had not committed. In 1979, a psychiatrist diagnosed this informant as a pathological liar. Prosecutors subsequently used this informant's testimony against defendants in either five or six cases. *Id.* at 16.

The number of informants was staggering. One defense attorney described a case in which, at the preliminary hearing, eight jailhouse informants claimed his client made incriminating statements. Other informants called the attorney and offered to testify on his client's behalf. The attorney described the preliminary hearing as "a dream world where everybody was either lying or fabricating or then recanting a prior lie or then making something up. It got to be a nightmare where you couldn't believe one person or the other." *Id.* at 39.

High profile cases attracted the most informants. In some cases, up to twenty informants would come forward claiming to have heard a confession. *Id.* at 111. The Grand Jury found a general consensus among defense attorneys that "jail house informants seemed to invariably be available to testify in important cases." *Id.* at 37. Of all the death penalty cases tried in Los Angeles from 1978 through 1990, approximately one third involved a jailhouse informant testifying that the defendant had confessed to him. *Id.*

The Grand Jury found that informants were given numerous benefits. Examples include being transferred to a cell with a TV, coffeepot, and other amenities, being taken outside the jail for lunch, having witness protection money paid to an informant's wife, and having a girlfriend being held on a one million dollar bail released on her own recognizance. *Id.* at 13-15. At least two informants testified to instances where they or an informant they knew were transferred to a jail perceived to be more desirable. *Id.* at 14. The Grand Jury also found many examples of prosecutors dropping charges, writing letters on informants' behalf to the parole board, or asking a court to impose a lower sentence. *Id.* at 13.

Benefits to informants were not generally disclosed to the defense. The prosecutors' rationale for failing to disclose the benefits was that there was only an implicit understanding that the authorities would help the informant in exchange for his testimony. The Grand Jury explained:

> The entire circumstances regarding benefits and the expectations of benefits, in many cases, are not adequately presented to the judge or jury for them to have the necessary factual basis to evaluate the testimony of the informant. This is particularly so when an agreement on the extent of benefits is not made with the informant until after the testimony.

*Id.* at 76. Later, along similar lines, the Grand Jury found:

> The practice of waiting until after the testimony is provided, before the informant's pending case is dealt with, may lend itself to some troubling results. This may provide the informant with a basis for assuming that his sentence will be measured by the assistance he provides the prosecution by his testimony. In view of the benefits that he may be seeking by his testimony, the potential for perjury or shading of testimony for the prosecution must be recognized.

*Id.* at 95 (emphasis omitted). One defense attorney, in testimony to the Grand Jury, described the system as being like

> a 'secret society' where even though nothing is said, the prosecutors and the informants know that some benefit will flow to the informant for his testimony. The defense attorney explained it was extremely difficult to try to impeach jail house informants when there was nothing in the record relating to benefits they were to receive from their testimony.

*Id.* at 39.

The Grand Jury concluded that the Los Angeles District Attorney's office was aware of abuses concerning jailhouse informants well before Leslie White's 1988 revelations. Evidence supporting this conclusion went back to the late 1970s. *Id.* at 97. The Grand Jury was particularly critical of the District Attorney's office's failure to keep any database of jailhouse informants. *Id.* at 105-117. It noted that in the high profile cases in which twenty informants would claim to have heard a confession, the informants "were narrowed to a very few, sometimes to only one or two witnesses. No record was kept of those who were rejected and the reasons for that determination. If the informants were again to offer testimony in other cases, there existed no systematic means to review the knowledge obtained by the earlier prosecutor." *Id.* at 111.

The Grand Jury report discussed a proposal to create a repository of very basic information about jailhouse informants. The District Attorney's office rejected this proposal. "The reason consistently offered by officials for deciding against the informant system was that defendants might discover information contained in the index." *Id.* at 115. The report found that "[n]either a defendant's rights to know about information affecting the credibility of an informant, nor a prosecutor's obligation to disclose such information to a defendant, was ever mentioned during the discussion of the pros and cons of an informant index, according to all sources of evidence presented to the Grand Jury." *Id.* at 117.

The Grand Jury reached two overarching conclusions:

A.  The Los Angeles County District Attorney's Office failed to fulfill the ethical responsibilities required of a public prosecutor by its deliberate and informed declination to take the action necessary to curtail the misuse of jail house informant testimony.

B.  The Los Angeles County Sheriff's Department failed to establish adequate procedures to con-

> trol improper placement of inmates with the
> foreseeable result that false claims of confes-
> sions or admissions would be made.

*Id.* at 6.

The Grand Jury discussed potential relief for defendants, like Gonzales, who had been convicted based on informants' potentially false testimony during the period covered by the report. "Because the judgments are final, the review must be sought by Petition for Writ of Habeas Corpus. In filing such petitions, certain factual allegations must be made which are legally sufficient to support the relief sought. It is difficult and in some cases likely not possible to allege sufficient facts without discovery." *Id.* at 152. The Grand Jury noted that the question of whether defendants could get such post-judgment discovery was currently before the California Supreme Court. *Id.* The Grand Jury was almost certainly referring to Gonzales's case which was then pending in that Court. The Grand Jury noted that the District Attorney's office had been cooperative during the investigation. It expressed the hope that "[i]n the event post-conviction discovery is denied by the [California] Supreme Court . . . the District Attorney will be equally cooperative in considering the needs of affected parties for the information necessary to pursue their remedies." *Id.* at 153.

## C.   State Court Proceedings After the Grand Jury Report

The Grand Jury's hope went unfulfilled. As I describe below, the District Attorney's office did not remain "equally cooperative" in Gonzales's case, and the California Supreme Court denied post-conviction discovery.

Gonzales was sentenced to death on May 7, 1981. Shortly thereafter, Gonzales filed a habeas petition in the California Supreme Court. He filed an amended habeas petition on June 10, 1986. Between the time of his death sentence and his habeas filings, Gonzales had been able to obtain almost no

additional information concerning Acker. He raised a *Brady* claim in his state habeas petition, but his discussion of the claim was brief, occupying only six of seventy-seven pages. In this initial habeas petition, Gonzales claimed that the prosecutor had not disclosed the extent of Acker's cooperation with the police in other cases. Gonzales argued that this violated *Brady* because such information would have allowed him to argue that Acker's testimony violated the Sixth Amendment based on *Massiah v. United States*, 377 U.S. 201 (1964), and *United States v. Henry*, 447 U.S. 264 (1980). *See People v. Gonzalez*, 800 P.2d 1159, 1192 (Cal. 1990).

In October 1988, after Gonzales filed his amended state habeas petition, Leslie White triggered the informant scandal and subsequent Grand Jury investigation. The information that came out during the investigation suggests strongly that Acker was involved in the schemes described in the Grand Jury report. First, Acker's informing fit the time frame of the report. The report covered 1979 through 1990. Gonzales's case, in 1979, was the first case in which Acker gave information concerning an alleged confession. Acker then gave information about five more alleged confessions over the next two years. Second, Acker was placed near Gonzales for two weeks shortly after Gonzales was arrested. Gonzales was arrested on May 29, 1979. He had been shot and taken from the scene in an ambulance, then later taken to the jail. His conversations with Acker took place in early July 1979. This sequence of events is consistent with the Grand Jury's finding that the Sheriff's Department placed informants near inmates from whom they wanted a confession. Third, the Sheriff's Department would have been particularly interested in a confession from Gonzales because he had shot a Sheriff's Department deputy. Fourth, the Grand Jury found that jailhouse informants were more likely to have allegedly heard confessions in death penalty cases. Finally, Acker claimed to have been helping Gonzales check the accuracy of his attorneys' work when Gonzales allegedly confessed to him. The Grand Jury found that informants would offer to assist inmates,

based on their purported legal experience, in order to obtain information about the inmates' crimes. Grand Jury Report at 31.

Starting in November 1988, while the Grand Jury investigation was still ongoing, the District Attorney's office began to address its use of perjured testimony by jailhouse informants. In various memoranda, the office indicated that any problems with the reliability of past jailhouse informants would be revealed to the state courts. On November 17, 1988, Chief Deputy District Attorney Gregory Thompson sent a memorandum to the Deputy District Attorneys, alerting them to the pending review of the office's use of jailhouse informants. With respect to informants who had been used in the past, Thompson wrote that "the most objective way to do this is on a case by case basis before the court. This will insure an independent review on the merits of each case." On November 30, 1988, in a letter to various defense attorneys, including Gonzales's attorney, Thompson again emphasized his intention to make information obtained available through court proceedings:

> [W]e planned from the outset to make the information we obtained [through internal investigations] available to defense counsel on individual cases and anticipated that, in appropriate cases, that information would be thoroughly aired in open court. . . . The best forum for an objective, thorough examination of the issues is in open court. . . . Further, the court is the only forum where any wrongs can be righted, where any breach in procedure can be assessed, where any prejudice can be weighed, where any injustice can be addressed. It is our aim that every pertinent, relevant issue on each contested case receive the careful and thorough attention of the court.

Thompson also sent letters specifically addressed to attorneys representing clients in whose trials jailhouse informants

had testified. The letter to Gonzales's attorney informed him of the investigation into the use of informants. The letter concluded, "[S]ince the courtroom is the appropriate forum in which to fully explore this issue, our office will join with you in expediting the hearing of any appropriate motion you may wish to bring." Based in part on this letter, on March 29, 1989, Gonzales's attorneys filed a 77-point discovery motion with the state court judge who had presided over Gonzales's trial. The motion sought discovery of information that would reveal whether the prosecution had violated its obligations under *Brady* to disclose information concerning Acker. Among the information requested was, "Any and all California Department of Corrections Health and Welfare Agency records pertaining to WILLIAM GERALD ACKER." The primary basis for the motion was the information that had come to light during the Grand Jury investigation of the informant scandal.

The state court trial judge held an initial hearing on Gonzales's discovery motion in June 1989. Despite the Los Angeles County District Attorney's repeated prior statements that it wanted to air in open court whatever information it possessed concerning jailhouse informants, it now argued that because there was no proceeding currently before the trial court, that court had no jurisdiction over the case. In response, the judge noted the "very unique factual situation that's involved in this case." He said that "if all of the information is true with respect to the allegations that have been made by [Gonzales's attorneys], I think it puts this case in an entirely different posture." He stated that "fundamental fair play in this case would indicate that [Gonzales] ought to get that information." In a second hearing in August, the trial judge granted the discovery motion. He made clear his belief that "the District Attorney's Office has got to accept much of the responsibility for what occurred, in the sense that . . . at no time did your office ever maintain any coordinated effort . . . so that the problems which arose could have been prevented."

The state filed a writ of mandate with the California Supreme Court, seeking to reverse the trial judge's discovery order. The state argued not only that the judge had no jurisdiction to issue the discovery order, but also that "Gonzalez did not make the showing necessary for a grant of discovery." The California Supreme Court consolidated the writ of mandate appealing the trial judge's discovery order with Gonzales's habeas petition then pending in the Supreme Court.

Gonzales offered to drop his discovery motion if a representative of the District Attorney's office would swear under penalty of perjury that the state's files contained no material evidence relating to Acker's testimony. The District Attorney's office did not accept the offer. *Gonzalez*, 800 P.2d at 1219 n.8 (Broussard, J., dissenting). Gonzales's habeas attorney wrote in one of her filings to the California Supreme Court, referring to Thompson's November 30, 1988, letter, "For close to one year, Counsel in this case as well as other cases, all of which are in differing procedural postures, have attempted to ascertain the name of the mysterious but 'appropriate motion' that the District Attorney would join in. These efforts have met with overwhelming silence."

The California Supreme Court granted the state's writ of mandate, reversing the trial judge's discovery order. It concluded that "the trial court lacked jurisdiction to order 'free-floating' post-judgment discovery when no criminal proceeding was then pending before it." *Gonzalez*, 800 P.2d at 1203. The Supreme Court also refused to grant discovery in the pending state habeas petition Gonzales had filed directly in the Supreme Court. *Id.* at 1205. The Court wrote that a habeas corpus proceeding does not "trigger a right to unlimited discovery." *Id.* A habeas petition "must set forth specific facts which, if true, would require issuance of the writ. Any petition that does not meet these standards must be summarily denied, and it creates no cause or proceeding which would confer discovery jurisdiction." *Id.* Even treating the discovery request and grand jury report as an amendment to the habeas

petition, the Court concluded that Gonzales had failed to set forth facts requiring the issuance of the writ. It wrote:

> At most, there are new indications that during the period 1979-1988, various residents of the Los Angeles County jail developed successful schemes for fabricating jailhouse confessions by other inmates, and that these practices were ignored or even encouraged by the authorities. However, nothing in the materials before us identifies Acker as a participant in the schemes alleged. Nor is there any specific indication that the prosecution's files would yield information that substantially undermines Acker's testimony. . . . [T]here is no postconviction right to "fish" through official files for belated grounds of attack on the judgment, or to confirm mere speculation or hope that a basis for collateral relief may exist.

*Id.* (footnotes omitted).

The California Supreme Court thus concluded that despite the revelations of the District Attorney's massive use of perjured testimony of jailhouse informants; despite the District Attorney's failure to establish any database system concerning jailhouse informants for fear that such a system would undermine the effectiveness of their testimony at trial; despite the similarities between Acker's story and the schemes detailed in the Grand Jury report; and despite the state's assurance in its letters to defense attorneys that it wanted any problems concerning jailhouse informants to be aired in court, Gonzales's attempt to discover potential *Brady* material concerning the jailhouse informant's testimony in his case was a fishing expedition. The Court ended its opinion: "We expect and assume that if the People's lawyers have [*Brady*] information in this or any other case, they will disclose it promptly and fully." *Id.* at 1206.

### D.   Psychiatric Reports

The Court's stated expectation and assumption were wrong. The state disclosed nothing to Gonzales voluntarily. Gonzales finally obtained a discovery order in his habeas proceeding in federal court. Under compulsion of the federal court order, the state finally revealed previously undisclosed information about Acker. The most damning information was contained in six psychiatric reports prepared while Acker was incarcerated in California prisons. If the California Supreme Court had allowed the discovery that Gonzales had sought — and indeed had been granted by the trial court — these reports would have been in the state court record on state habeas.

These psychiatric reports could have been used to impeach Acker in three ways. First, they demonstrate that Acker was willing to lie and manipulate prison medical staff in order to get what he wanted. Psychiatric evaluations reveal that Acker admitted attempting or faking suicide on three occasions in order to obtain prison transfers. A 1972 Psychiatric Evaluation reported that Acker admitted that he had faked suicide at the Norwalk Receiving Center in order to be placed in the hospital, from which it would be easier to escape. A 1973 Psychiatric Evaluation reported an attempted hanging, this time in the California Men's Colony ("CMC") East Facility. The Evaluation noted that Acker "stated that that was only a gesture designed to prevent his egress from CMC East." Finally, a 1974 report describes another suicide attempt in April or May of that year at K-Wing of the Duel Vocational Institution ("D.V.I."). Acker stated "that he made a suicidal gesture in order to get out of K-Wing at D.V.I." He claimed that "his suicidal gesture was the only way that he could get out of D.V.I.'s K-Wing. Claims that if he ever goes back [to] that madness again at D.V.I. he will attempt the same thing again; namely, a suicidal gesture."

Many of the psychiatric evaluations specifically noted Acker's manipulative behavior. One psychiatrist reported that

Acker asked, "and it was my distinct impression that this was made in all seriousness, as to 'how much money would it take to give me a good report.' " Another psychiatrist described Acker as "the type of an individual who was constantly testing me." In a diagnostic study prepared for Acker's sentencing for his murder conviction, Dr. Flanagan, who examined Acker, recommended that Acker be "considered capable of any measure of brutality in the service of achieving what he wants to do." He further described him as "intelligent, manipulative, [and] unscrupulous." The Social Evaluation included in the diagnostic study noted that Acker had been "offered therapy in the past and has used it as a tool to get out of prison early and has not attempted to use it as a tool to change his own behavior." This evidence of Acker's lying and manipulation would have been extremely valuable to Gonzales, as Bencangey had no examples during trial of Acker either lying or manipulating to his own advantage. The evidence shows the extent to which Acker was willing to go to obtain prison transfers, the precise reason he testified he was informing against Gonzales. Jurors could easily have concluded that if Acker was willing to repeatedly fake suicide to obtain a prison transfer, he would be willing to fabricate a confession to obtain such a transfer.

Second, these reports could have been used to impeach Acker on his claim that he had started testifying because he wanted to achieve a new "moral balance." As I describe above, Acker had testified that one of his primary motivations for giving information to the authorities in Gonzales's case was to turn his life around and to do the right thing. In 1972, Acker had told Dr. Land that he was now on the right path because he had "undergone a religious experience" and he "believes he has found the true religion." After this claimed conversion, Acker was released from prison. Acker then committed first-degree murder and numerous robberies. That Acker had previously lied about turning his life around in order to obtain his release from prison, and that in fact he had not turned his life around, would have substantially under-

mined his claim at Gonzales's trial that he was testifying because he wanted to achieve a new "moral balance."

Third, these reports could have been used as evidence of Acker's mental illness. Acker was diagnosed with "schizophrenia, chronic, undifferentiated type" as early as 1974. In 1975, he was diagnosed with "[s]chizophrenia, residual type." A 1977 report noted that Acker "has a severe personality disorder, and he has previously been diagnosed as schizophrenic." It further described him as "mentally unstable." We have repeatedly recognized the impeachment power of mental illness. *See, e.g.*, *Silva v. Brown*, 416 F.3d 980 (9th Cir. 2005).

During discovery for his federal habeas claim, Gonzales was allowed to take Acker's deposition. Acker's response to being confronted with these reports in his deposition suggests how he would have responded on the witness stand during trial. First, Acker repeatedly denied making suicidal gestures to obtain transfers and denied bribing prison psychiatrists. When confronted with the report from Dr. Land that he had admitted to having faked suicide in order to be placed in the hospital, Acker responded, "I don't even know this dude," and denied that this had occurred. When confronted with another report about the same incident, Acker described the report as "a totally bogus statement right there." When confronted with the report in which he had admitted that his suicidal gesture was the only way to get out of D.V.I.'s K-Wing, Acker denied making the statement, saying, "That never happened, man." When confronted with another report about the K-Wing incident, Acker said, "I don't think I ever said that. And if I did, I lied." Finally, in responding to Dr. Malloy's report, which recounted Acker's attempt to bribe him, Acker denied the incident, describing the report as "full of shit, man." Second, Acker attacked the psychiatrists who evaluated him. When asked whether Dr. Flanagan was lying when he stated that Acker would do anything to get what he wanted, Acker responded, "Dr. Flanagan is full of crap." He further stated, while Gonzales's federal habeas attorney was preparing a

question, "If they're psychiatrist things, don't go there, man, because they're all mostly bogus."

Acker's psychiatric reports, combined with his response to those reports, would have severely undermined Acker's credibility at trial. The reports would have revealed that obtaining a prison transfer was so important to Acker that he was willing to fake suicide, manipulate medical professionals, and bribe a prison psychiatrist. Acker's responses to these reports on the stand would have revealed Acker as a liar, consistently denying events reported by prison psychiatrists.

Gonzales, however, did not have these reports during trial, for the state had successfully concealed them. Gonzales also did not have these reports during his state habeas proceeding, for the state, assisted by the ruling of the California Supreme Court, had again successfully concealed them.

### E.   *Pinholster*

I believe we can consider the six psychiatric reports consistent with the Supreme Court's decision in *Pinholster*. I would hold that when a petitioner's inability to present *Brady* evidence to the state courts is due to the refusal of the state court to allow appropriate discovery, *Pinholster* does not bar federal courts from considering that evidence in the first instance.

*Pinholster* does not answer the question whether federal courts can consider evidence that a petitioner tried to discover in state court, but was prevented from discovering by the state court. Justice Sotomayor stated in her dissent in *Pinholster*, "I assume that the majority does not intend to suggest that review is limited to the state-court record when a petitioner's inability to develop the facts supporting his claim was the fault of the state court itself." 131 S. Ct. at 1417 n.5. Justice Sotomayor cited the oral argument transcript in *Bell v. Kelly*, a case in which this question was presented, but in which the Supreme Court dismissed certiorari as improvidently granted.

*Bell v. Kelly*, 553 U.S. 1031, 1031 (2008) (granting certiorari on question of whether § 2254(d) applies to a claim predicated on evidence the state court refused to consider and that was properly received for the first time in an evidentiary hearing on federal habeas); *Bell v. Kelly*, 555 U.S. 55, 55 (2008) (dismissing certiorari as improvidently granted). The majority in *Pinholster* never contradicted Justice Sotomayor's assumption.

The state-court procedural history in *Pinholster* bears no resemblance to this case. Pinholster made an ineffective assistance of counsel claim in his state habeas petition. *Pinholster*, 131 S. Ct. at 1396. He relied primarily on the medical diagnosis of a single psychiatrist. *Id.* On federal habeas, Pinholster presented evidence from two new medical experts who diagnosed him with organic personality syndrome and partial epilepsy and brain injury. *Id.* at 1397. Pinholster could have presented the opinions of these experts to the state court. Indeed, the question presented in *Pinholster* was "[w]hether a federal court may reject a state-court adjudication of a petitioner's claim as 'unreasonable' . . . based on a factual predicate for the claim that the petitioner could have presented to the state court but did not." Pet. for Writ of Cert., *Pinholster*, 131 S. Ct. 1388 (No. 09-1088). The focus of the oral argument in *Pinholster* was on evidence that could have been presented in state court. *See, e.g.*, Transcript of Oral Argument at 29, *Pinholster*, 131 S. Ct. 1388 (No. 09-1088) (Justice Kennedy: "Was it the court relied on different evidence, evidence that was not in the State hearing? And that's the question, whether or not they can do that, if this evidence could have been presented. And certainly it could have been presented."); *id.* at 38 (Justice Alito: "The factual predicate of the claim is the new evidence that's brought forward in . . . the Federal proceeding, and unless there is a good reason why that wasn't brought forward in the State proceeding, it shouldn't be considered.").

Based on the revelations of the Los Angeles District Attorney's use of perjured testimony, Gonzales knew during his

state habeas proceedings that there was a strong probability that there was undisclosed *Brady* material about Acker. Gonzales also had letters from the state effectively inviting him to file a discovery motion seeking such material. The state trial judge who had presided over Gonzales's trial granted his post-trial discovery motion. But Gonzales was opposed on all fronts by the state, and rejected on all fronts by the California Supreme Court. Unlike Pinholster, who could have put the relevant evidence before the state court but failed to do so, Gonzales tried every means possible for putting the evidence before the state court, but was prevented from doing so by the combined actions of the prosecutor and the state Supreme Court.

As Judge Clifton's opinion in this case notes, some of the language in *Pinholster* could be read to cover this case. However, given that the language in *Pinholster* goes beyond the question before the Court, and given the dramatic differences between *Pinholster* and this case, I would not read the language broadly to cover the case before us. "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision." *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 363 (2006) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399-400 (1821)). I therefore read *Pinholster* as leaving open the question whether federal courts can consider new evidence in a § 2254(d)(1) case when the petitioner's failure to introduce the evidence in state court was, as here, the "fault of the state court itself."

I would hold that we can consider such evidence. A longstanding rationale for excluding new evidence is that federal courts should not reward petitioners whose failure to introduce evidence in state court was due to their lack of diligence. This diligence requirement is codified in 28 U.S.C.

§ 2254(e)(2), which generally bars the introduction of evidence on federal habeas if the petitioner "has failed to develop the factual basis of a claim in State court proceedings." The Supreme Court has held that a petitioner has not "failed to develop" the factual basis of a claim when the petitioner was "not at fault" for the failure. *See Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (citing *Williams v. Taylor*, 529 U.S. 420, 431-37 (2000)). Before *Pinholster*, courts of appeal interpreted the diligence requirement in § 2254(e)(2) as the only limitation on the introduction of new evidence in federal court. *See Pinholster*, 131 S. Ct. at 1417 (Sotomayor, J., dissenting) ("The majority charts a . . . novel course that, so far as I am aware, no court of appeals has adopted."). So long as the petitioner had satisfied the requirements of § 2254(e)(2), courts of appeal had held that federal courts could consider new evidence even for a claim governed by § 2254(d)(1).

In *Pinholster*, the Court emphasized a different rationale than lack of diligence by the petitioner for refusing to consider evidence presented for the first time to a federal court. The Court held that for a federal court to conclude that a state court "unreasonabl[y] appli[ed]" federal law based on evidence that was not before it is to bypass the state court's decision-making process. The Court's holding was "compelled by the broader context of the statute as a whole, which demonstrates Congress' intent to channel prisoners' claims first to the state courts." *Pinholster*, 131 S. Ct. at 1398-99 (internal quotation marks and citations omitted). It was based on prior cases holding that "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399.

The Court's interpretation of the "unreasonable application" language as barring the introduction of new evidence in federal court makes sense when the petitioner's failure to introduce the evidence in federal court was unrelated to any defect in the state court process. However, when a petitioner's failure to introduce evidence before the state court is due to the state court's unwarranted refusal to allow the petitioner to

discover the evidence, consideration of the new evidence by
the federal court is appropriate. The state court had the oppor-
tunity to obtain and consider the evidence, but chose not to do
so.

In this case, the state court was presented with the same
well-founded discovery request that, in federal court, revealed
the undisclosed *Brady* material. In ruling on Gonzales's dis-
covery request, the state Supreme Court knew that the Los
Angeles District Attorney's office had been regularly using
the testimony of jailhouse informants who were unreliable
and had given perjured testimony. It knew that Acker was a
jailhouse informant whose story was very similar to the sto-
ries of many of the perjuring informants discussed in the
Grand Jury report. It knew that the District Attorney's office
had told Gonzales's counsel, as well as the counsel for other
defendants, that "the courtroom is the appropriate forum in
which to fully explore" issues relating to jailhouse informants,
but that the office had then opposed all discovery requests.
And it knew that the judge who had presided over Gonzales's
trial, and who knew the case intimately, had been persuaded
to grant discovery.

The California Supreme Court nevertheless blocked Gon-
zales's attempts to obtain discovery to investigate Acker's
reliability. As Justice Broussard noted in his dissent to the
Supreme Court's decision, "whatever defendant tries, the
majority find a technical barrier." *Gonzalez*, 800 P.2d at 1219
(Broussard, J., dissenting).

> Specifically, the majority conclude that (a) defendant
> cannot get discovery in connection with his auto-
> matic appeal because the appeal is limited to the
> appellate record; (b) he cannot get discovery in an
> independent trial court action because discovery
> must be ancillary to a pending proceeding; (c) he
> cannot get discovery in connection with his pending
> habeas corpus petition because the issue of Acker's

perjury is not within the scope of the order to show cause; and, (d) even taking into account new allegations of Acker's perjury and new evidence which gives plausibility to those allegations, he cannot obtain discovery by filing a new habeas corpus proceeding alleging Acker's perjury because, without discovery, he cannot allege sufficient facts proving Acker's perjury to state a prima facie case. In short, the majority pose a perfect "Catch—22" logical conundrum, under which defendant cannot obtain discovery of the law enforcement records because without the information contained in those records he cannot file an action that would support discovery.

*Id.* In this circumstance, when the state court was faced with the same well-founded discovery request later presented to the federal court, it does not serve AEDPA's goals to send the diligent petitioner back to the very state court that blocked his attempt to discover the evidence in the first place.

Reading *Pinholster* to apply to a case where petitioner's failure to introduce the relevant evidence in state court is the fault of that court is inconsistent with one of the traditional purposes of federal habeas relief, which is to remedy inadequate state court factfinding. In *Townsend v. Sain*, the Supreme Court held that a federal district court must grant an evidentiary hearing to a habeas applicant if "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing." 372 U.S. 293, 313 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5-6 (1992). The "adequacy of a state-court procedure under *Townsend* is largely a function of the circumstances and the interests at stake. In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). To hold that an improper state court denial of discovery necessary to develop a federal constitu-

tional claim prevents a federal court from considering in the first instance evidence discovered during federal habeas unnecessarily binds the federal court to the inadequate fact-finding of the state court.

I would therefore hold that *Pinholster* does not bar our consideration of the evidence discovered by Gonzales. I would not reach the question of whether the *Brady* claim Gonzales raised in federal court is sufficiently distinct from the claim he raised in state court to constitute a "new claim." *See Pinholster*, 131 S. Ct. at 1401 n.10; *id.* at 1417-19 (Sotomayor, J., dissenting).

### Conclusion

I fully concur in the general application of *Rhines* to cases in which new evidence is introduced on federal habeas. However, for the reasons I have just given, I believe that in this case we have the authority, consistent with *Pinholster*, to decide Gonzales's *Brady* claim now. I would prefer to exercise that authority.

---

O'SCANNLAIN, Circuit Judge, dissenting in part:

I concur in most of the court's lead opinion today. With respect, however, I must dissent from its reversal and remand of Gonzales's claims pertaining to the alleged suppression of impeachment evidence. The test the lead opinion crafts directly conflicts with the Supreme Court's recent holding that "evidence introduced in federal court has no bearing" on claims that have been adjudicated on the merits before a state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011).

## I

As the lead opinion and the concurrence thoroughly discuss, Jesse Gonzales stands convicted of the intentional mur-

der of Los Angeles County Sheriff's Deputy Jack Williams. Gonzales has never denied that he killed his victim or that he intended to do so. Therefore, the only issue at his trial was whether he knew that Deputy Williams was a peace officer in the pursuit of his duties.

A primary issue throughout Gonzales's quest for post-conviction relief has been whether he had sufficient opportunity to impeach William Acker, a fellow inmate who testified that Gonzales confessed to wanting to "bag a cop." *See People v. Gonzalez*, 800 P.2d 1159, 1166 (Cal. 1990). As a result, the issue in *this* appeal is whether the California courts have already adjudicated this claim on the merits.

Acker told largely the same story regarding Gonzales's confession at the guilt phase trial and at both penalty phase trials in the state court. *See id.* at 1166-68. With every recounting, defense counsel more aggressively and extensively attacked the story's credibility. By the time the second penalty jury handed down its verdict, Acker had admitted that he testified in order to motivate authorities to transfer him to an out-of-state facility, that he was capable of lying to achieve his purposes, and that he had given information in more than half a dozen other cases, both before and after Gonzales's trial. *Id.* at 1168.

Nonetheless, in state post-conviction proceedings, Gonzales argued that by failing to disclose a complete picture of Acker's interactions with the police, prosecutors deprived him of a fair opportunity to cross-examine Acker in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). He also argued that his attorney provided constitutionally deficient counsel under *Strickland v. Washington*, 466 U.S. 668 (1984) by failing to discover this impeachment evidence.

The California Supreme Court soundly rejected these arguments, noting that at all stages of the trial, "cross-examination . . . [had] exposed evasiveness and inconsistencies in Acker's

claims about the exact nature of his relationship with the authorities." *Gonzalez*, 800 P.2d at 1193. It found that the "additional details [discovered by Gonzales during state proceedings did] not paint a significantly different picture of Acker's character and motives than appears on the record." *Id.* And it held that "[e]ven if this information was overlooked by trial counsel or should have been proffered by the prosecution, its omission was harmless beyond a reasonable doubt and does not undermine confidence in the guilt or penalty verdicts." *Id.*

In September 1996, Gonzalez petitioned for a federal writ of habeas corpus. Discovery in the federal proceeding revealed a total of six newly-obtained psychological reports, each of which drew a different conclusion about Acker's mental health. Memorandum and Order Denying Petitioner's Second Motion for Reconsideration, No 2:95-cv-02345-JVS, (C.D. Cal. 2008) (hereinafter "Second Reconsideration Order"). Acker's first examination in August 1972 revealed "no evidence of psychosis." *Id.* at 33. In 1973, doctors noted that Acker was "depressive" and that he had "an extremely poor image of himself." *Id.* at 30 (internal quotation marks omitted). It was not until June 1974 that anyone suggested that Acker had schizophrenia. *Id.* at 31. A second opinion given only a month later found no "overt psychiatric condition." *Id.* at 33. In 1975, a staff psychologist once again mentioned schizophrenia. *Id.* at 32. But in his most recent evaluation, Chief Psychiatrist R.L. Flanagan refused as unnecessary Acker's requested psychiatric medication. *Id.* 28-30.

At most, these reports suggest that Acker has an antisocial personality and that he tries to manipulate the prison system to obtain transfers to his preferred place of detention. The district court concluded that while "the investigation 'increased the quantity and the quality of possible impeachment matter against Acker,' " the withheld information was not material because Acker was already extensively impeached and was not the only evidence relating to the special circumstance.

Second Reconsideration Order at 40 (quoting Order on Respondent's (sic) [First] Motion for Reconsideration, No 2:95-cv-02345-JVS, (C.D. Cal. 2003)). As such, the court denied him habeas relief. *Id.* at 52, 77.

## II

Because Gonzalez filed his habeas petition after April 24, 1996, our authority to grant him relief is limited by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). As the Supreme Court has repeatedly reminded us, we may not grant relief in an AEDPA case just because we would have come to a different conclusion regarding a particular prisoner's claim. *See Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Instead "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (*quoting Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Applying this standard, the lead opinion properly determines that the California Supreme Court's finding of "no prejudice [from any failure to provide *Brady* information], based on the material known to it at the time of its decision, was not unreasonable." Slip op. at 20706 n.10.

Rather than consigning this conclusion to a footnote, we should have made it the end of our review. Just last Term, the Court unequivocally held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 131 S. Ct. at 1400. Because "evidence introduced in federal court has no bearing on § 2254(d)(1) review," a state court's decision on

the merits simply may not be impugned on the basis of such evidence.[1]

## III

Apparently displeased that we may not grant Gonzales habeas relief based upon information introduced in federal court, the lead opinion today patches together an end run around *Pinholster*'s holding from (1) a hypothetical problem cited in its dissent, (2) a hypothetical solution posed in a concurrence, (3) a footnote in the majority opinion responding to both, and (4) an incredibly broad definition of the word "claim."[2]

Writing in dissent in *Pinholster*, Justice Sotomayor ruminated about the plight of a defendant who discovers additional evidence of prosecutorial misconduct after he exhausts all possible methods of relief. In her hypothetical, the defendant's initial habeas petition brings an unsuccessful *Brady* claim. *Id.* at 1418. The defendant then discovers additional

---

[1] Given the Court's deliberate use of the term "hold" and the centrality of the question to the case, I am perplexed by the concurrence's attempt to dismiss this language as dicta. There simply is no open question of "what federal courts should do when confronted with . . . evidence" not yet presented to the state court. Slip op. at 20737. If "evidence introduced in federal court has no bearing on § 2254(d)(1) review," *Pinholster*, 131 S. Ct. at 1400, it has no influence in federal habeas petitions.

[2] Responding to Part III of the lead opinion, I respectfully must insist that it creates an unacceptably broad definition of what constitutes a new claim. Otherwise, it is unclear on what basis it may grant any relief. For if—as the lead opinion's response seems to concede—Gonzales's claim is *not* new, AEDPA's "backward-looking language requires an examination of the state-court decision *at the time it was made*." *Pinholster*, 131 S. Ct. at 1400 (emphasis added). Developments in the record or in the law between the last state decision on the merits and our review on habeas are simply irrelevant. *Id.*; *see also Greene v. Fisher*, No. 10-637, 2011 WL 5335411 (U.S. Nov. 8, 2011). As is whether we think that "focus[ing] on what a state court knew and did," *Pinholster*, 131 S. Ct. at 1399, creates "an unjust and illogical result," slip op. at 2-736. Because that is precisely what Congress has said, Pinholster, 131 S. Ct. at 1399, it is precisely what "the law requires." Slip op. at 20736.

exculpatory statements that were suppressed by the prosecution, but "state law would not permit the petitioner to present the new evidence in a successive petition." *Id.* (citing Virginia state law). In a footnote, the Court majority suggested that in such circumstances, the defendant "*may* well present a new claim." *Id.* at 1401 n.10; *see also id.* at 1412 (Breyer, J. concurring). It refused, however, to adopt Justice Sotomayor's view. *Id.* at 1401 n.10.

Ignoring the fact that unlike Justice Sotomayor's hypothetical prisoner Gonzales could, and should, have sought to file a new state petition,[3] the court today snatches that suggestion and treats it as the law. Then, without analysis, the court concludes that rather than entering "new evidence [which] merely bolsters [his old] *Brady* claim," *id.* at 1418, Gonzales has presented an entirely new claim. Slip op. at 20701. Slip op. at 20737 (Fletcher, W., concurring) ("I agree with Judge Clifton, that we may treat [evidence that was not before the state court] in the same way we treat unexhausted claims."). The lead opinion places no limits on this conclusion other than that the state court could *reasonably* find in Gonzales's favor.

I cannot ascribe to this view. Not only does it virtually ignore *Pinholster*, it is inconsistent with prior Supreme Court case law that has carefully distinguished between "the presentation of additional facts to the district court" and "the substance of [a petitioner's] claim." *Vasquez v. Hillery*, 474 U.S. 254, 258 (1986). Until today, we have never treated new evidence to be an entirely new claim unless it "place[d] the case in a significantly different . . . evidentiary posture." *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988) (internal quotation marks omitted); *see also id.* at 884 (Poole, J., dissenting) (requiring that the new evidence "fundamentally alter[ ] the nature of [the] claim" for relief).

---

[3]California has a general "policy . . . to deny a new application unless there has been a change in the facts or law," but its Supreme Court has long held that "this policy is discretionary." *In re Bevill*, 442 P.2d 679, 684 n.9 (Cal. 1968).

Furthermore, the lead opinion's conclusion severely undermines "AEDPA's goal of promoting . . . finality," *Pinholster*, 131 S. Ct. at 1401 (internal quotation marks omitted) and of " 'reduc[ing] delays in the execution of state and federal criminal sentences, particularly in capital cases.' " *Rhines v. Weber*, 544 U.S. 269, 276 (2005) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).

While the lead opinion appeals to comity and federalism as alternative purposes of AEDPA, its opinion does little, if anything to serve these important considerations. Its rule as to what constitutes a "new claim" arguably entitles state court prisoners to the opportunity to re-litigate any claim so long as they introduce some modicum of new evidence that, when aggregated with the existing evidence, would allow a reasonable state court to find in the petitioner's favor. It is difficult to see how federalism and comity are served by requiring the state courts to reconsider so many "new claims" while a federal habeas court looms in the background.

**IV**

Gonzales's *Brady* and *Strickland* claims are not new. As in the state court, he alleges that the prosecutors violated their *Brady* obligation by failing to disclose impeachment evidence pertaining to Acker. While the specific items about which he complains are different, the claim relates to the same duty by the same prosecutor as it pertained to the same witness. Nothing in the new evidence "place[s] the case in a significantly different evidentiary posture" when compared to the appropriate standard. *Aiken*, 841 F.2d at 883-84 (internal quotation marks omitted).

Because this is an AEDPA case, we may grant habeas relief only if "the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and, nevertheless, arrives at a result different from its precedent." *Lambert v. Blodgett*, 393 F.3d 943, 974

(9th Cir. 2004) (citing *inter alia Lockyer v. Andrade*, 538 U.S. 63, 73(2003)). The lead opinion cites no such case. The Supreme Court case on which its analysis depends, *Banks v. Dretke*, 540 U.S. 668 (2004), is easily distinguishable from Gonzales's situation. There, the prosecutor concealed that the witness at the heart of his case was a paid informant. *Id.* at 702. As a result, the defense was able to impeach this witness using only two other witnesses who were themselves impeached and evidence of drug use that the prosecutor was able to turn to his advantage. *Id.* Under such circumstances, the Court concluded that the concealed evidence was not cumulative. *Id.*

By contrast, as the district court found here, Acker was "extensively impeached" based on his own admissions of his willingness and motivation to lie. Second Reconsideration Order at 63. And such secondary evidence of his propensity to lie was, in fact, cumulative. His testimony was also "less central than the petitioner [and now the lead opinion and the concurrence] would have [us] believe." *Id.* As the lead opinion notes, to have the necessary special circumstance, Gonzales need only have known that Williams was a peace officer in the performance of his duties when he pulled the trigger. Slip op. at 20730-31 & n.16. The testimony of several police officers regarding the implausibility of Gonzales's story also went to that point. As such, the state court could reasonably deny Gonzales relief without violating *Banks*, and Gonzales is not in a fundamentally different evidentiary position.[4]

That this newly discovered evidence does not present a new claim is even more apparent with Gonzales's arguments based

---

[4]In an AEDPA case, our prior case law may serve only as persuasive authority, *Mejia v. Garcia*, 534 F.3d 1036, 1042 (9th Cir. 2008). And similar considerations make the lead opinion's analogy to cases such as *Silva v. Brown* unpersuasive. 416 F.3d 980, 984, 989 (9th Cir. 2005) (concluding that impeachment evidence regarding a witnesses whose testimony "the district attorney . . . agreed. . . would be necessary to convict" the defendant was material).

on *Strickland*. If Gonzales's attorney did not violate professional standards by not discovering Acker's other criminal convictions, which were matters of public record, *see Gonzales*, 800 P.3d at 1193 (declining to fault Gonzales's attorney for failing to discover additional evidence to impeach Acker), he could not have committed such a violation by failing to discover the contents of Acker's psychological reports, which were not similarly available. Second Reconsideration Order at 49-50 (discussing this *Strickland* claim).

**V**

Even if the lead opinion and the concurrence were correct and the psychological reports fundamentally altered the nature of Gonzales's claims, it still errs by ordering the district court to retain jurisdiction while Gonzales exhausts these claims. In *Rhines*, the Court concluded that a district court may *in its discretion* stay and abate a federal habeas petition, but "only in limited circumstances." 544 U.S. at 277. The Court warned that "[s]tay and abeyance, if employed too frequently, has the potential to undermine the[ ] . . . purposes" of AEDPA. *Id.* In particular, the Court instructed that the petition "should not be stayed indefinitely. . . . And if a petitioner engages in abusive litigation tactics or intentional delay, the district court should not grant him a stay at all." *Id.* at 277-78.

Contrary to the lead opinion's assertion, Gonzales has engaged in intentionally dilatory litigation tactics. He learned of the psychological reports in 2003. Second Reconsideration Order at 28. But, rather than requesting a stay so that he could present the supposedly new claims in the State courts, Gonzalez pressed ahead with not one, but two motions for reconsideration. As a result, the State has been arguing lack of exhaustion for the better part of a decade, *id. at* 41 (discussing the State's opposition to the First Motion for Reconsideration), yet Gonzales never sought to stay the federal proceedings to go back to the state court.

For the forgoing reasons, while I join most of the court's lead opinion, I respectfully dissent from its decision to remand Gonzales's claims.